JAMES THOMAS PORTER *v.* STATE OF MARYLAND

[No. 1649, September Term, 1979.]

*Decided November 7, 1980.*

The cause was argued before MOYLAN and WILNER, JJ., and IRVING H. FISHER, Associate Judge of the District Court of Maryland for District 5, specially assigned.

*Douglas R. Taylor* for appellant.

*Stephen Rosenbaum, Assistant Attorney General,* with

whom were *Stephen H. Sachs, Attorney General, Warren B. Duckett, Jr., State's Attorney for Anne Arundel County,* and *Marianne Stepler, Assistant State's Attorney for Anne Arundel County,* on the brief, for appellee.

FISHER, J., delivered the opinion of the Court. MOYLAN, J., filed a concurring opinion at page 105 *infra.*

John Robert Culb was shot and killed in the late evening hours of November 1, 1978, during the course of a robbery of the Myersville Gulf station in Myersville, Maryland, where he was employed. Appellant, James Thomas Porter, was convicted of the first degree felony murder of Mr. Culb, robbery with a deadly weapon and two counts of the use of a handgun in the commission of a felony. He was sentenced to life imprisonment, and fifty years, to be served consecutively.

On appeal, Mr. Porter's major contention involves the application of M.D.R. 723 a, which requires that an arrested person be presented "without unnecessary delay" before a judicial officer.[1]

Relying on the authority of *Johnson v. State,* 282 Md. 314, 384 A.2d 709 (1978), appellant contends that statements obtained in interrogations by the police after his arrest and during a period of detention should have been suppressed as being the product of an unnecessary delay in presenting him before a District Court commissioner. However, at the conclusion of the hearing on the Motion to Suppress, Judge Childs found, in his denial of the motion, that ". . . the

---

1. The full text of M.D.R. 723 a states:

A defendant who is detained pursuant to an arrest shall be taken before a judicial officer without unnecessary delay and in no event later than the earlier of (1) 24 hours after arrest or (2) the first session of court after the defendant's arrest upon a warrant or, where an arrest has been made without a warrant, the first session of court after the charging document is filed. A charging document shall be filed promptly after arrest if not already filed.

Effective July 1, 1979 M.D.R. 723 a has been amended to read:

A defendant who is detained pursuant to an arrest shall be taken before a judicial officer without unnecessary delay and in no event later than 24 hours after arrest. A charging document shall be filed promptly after arrest if not already filed.

All references to M.D.R. 723 a in this opinion are to the former version of the rule.

*Johnson* Doctrine is strictly for cases which approach the outer limits of twenty-four hours and . . . that, under the circumstances of this case wherein it was a Court holiday and the Court was not in session . . . that Rule 723 a was not violated and the statements will not be excluded . . ."

The trail that led to Mr. Porter's arrest and his conviction, although circuitous, can be briefly set forth. On November 4, 1978, appellant made a telephone call to the Culb home, identifying himself and informing Mrs. Culb, the widow of the victim, and her brother-in-law, that he was in possession of Mr. Culb's wallet. He was told to contact the Maryland State Police. Mrs. Culb's brother-in-law did inform the Maryland State Police, but it appears Mr. Porter did not. Instead Mr. Porter contacted Montgomery County Police Officer Plant, for whom Mr. Porter had served as a police informant. Mr. Porter met with Officer Plant on November 6, 1978, at which time he gave Officer Plant the wallet and an "explanation" of how it came to be in his possession. Plant met with Porter again the next day, and, unknown to Porter, had photographs taken of him. On November 9, 1978, one or more of those photographs was included in a photographic array presented to Mr. Aaron Hane, an attendant at the Myersville Exxon station. Hane identified Mr. Porter, from the array, as the person who had visited his station and bought a quart of oil from him in the late evening hours of November 1st, and who Hane observed walking toward the Myersville Gulf station after leaving his Exxon station. Later that day, the State Police presented this accumulated evidence to District Court Commissioner Barber, and obtained from him warrants to arrest Mr. Porter and search his home and automobile.

Porter was arrested at approximately 8:00 a.m. the next morning, November 10, 1978, at his home in Silver Spring by a team of officers, both uniformed and plain-clothed. He was handcuffed, informed of the charges against him,[2] and

2. There were several conflicts between the police officers and the appellant in the testimony presented at the pretrial suppression hearing. Mr. Porter testified that he was not informed of the charges against him until he reached the Frederick Barracks; that he was offered a deal for his cooperation; that his statement was videotaped before he was presented

removed to a waiting police cruiser. Both a Waiver of Prompt Presentment form and a Constitutional Rights form (*Miranda* warnings) [3] were read to him. Neither form was signed because of the handcuffs. Except for a brief stop to adjust Mr. Porter's handcuffs, he was driven directly to the Frederick State Police Barracks, arriving there at approximately 9:00 a.m. Mr. Porter was placed in a holding cell. He was neither processed nor presented to a commissioner, notwithstanding the fact that Commissioner Barber, who was also advised that the warrants would be executed on November 10th, called the Frederick Barracks shortly after Mr. Porter's arrival inquiring if anyone needed to be presented. Trooper Herring advised that Porter was in custody. Commissioner Barber informed the officer he would be available at his home for the next 30 to 45 minutes. When a subsequent call was made to Commissioner Barber's home, approximately 45 to 60 minutes later, he had already gone. No other attempt was made to contact a commissioner, although the record discloses that three or four were available in the Frederick area.

At approximately 10:15 a.m., Mr. Porter had his first interrogation session with the officers. He signed a Waiver of Rights form, but he refused to sign a Waiver of Prompt Presentment form.[4] The interrogation lasted until approximately noon. The substance of Mr. Porter's first statement concerned how he received the wallet, his phone calls to the Culb home and to Officer Plant.

Officer Plant conducted the second interrogation, which began at approximately 2:00 p.m., after a waiver of *Miranda* rights form was read to and signed by Mr. Porter. This session lasted approximately one hour. Although Mr. Porter continued to deny direct involvement with the murder and robbery of Mr. Culb, he gave Officer Plant a different version

---

before a commissioner; and that he believed this to be a "sham" arrest similar to one he participated in as a police informant with Officer Plant. The court obviously did not credit that testimony.

3. *Miranda v. Arizona*, 384 U.S. 436 (1966).

4. This form had been in use since approximately two months after it came into being, with instructions to the police to read it to detainees in the same manner as the *Miranda* warnings.

of how he obtained the wallet and admitted being in the Myersville area at the time of the incident. He also told Officer Plant that the gun, the subject of a previously unsuccessful search, was located in his basement bedroom.

At approximately 3:30 p.m. it was determined that a commissioner would soon be available at the Frederick District Courthouse. Mr. Porter had his initial appearance at approximately 4:30 p.m. Following his appearance before the commissioner, Mr. Porter was transported back to the barracks. At approximately 6:00 p.m., after he signed a waiver of *Miranda* rights form, he gave a third statement which was video-taped. This session lasted approximately one hour.

Appellant argues that the three statements, two before and one following his initial appearance, should have been suppressed, the first two because of a violation of M.D.R. 723 a, the third because it was tainted by the primary illegal detention.

In *Johnson v. State, supra,* the Court of Appeals made crystal clear that the requirements of M.D.R. 723 a were mandatory, embodying a "*sine qua non* in any scheme of civil liberties", *supra,* at 321, and that "any statement, voluntary or otherwise, obtained from an arrestee during a period of unnecessary delay in producing him before a judicial officer, thereby violating M.D.R. 723 a, is subject to exclusion when offered into evidence against the defendant as part of the prosecution's case-in-chief." *Supra,* at 328-29. If the delay exceeds the outer limits prescribed by the Rule (at the time, 24 hours or the first session of court), the statement is "automatically excludible . . . irrespective of the reason for the delay." *Id.* Where, as here, the delay is within those outer limits, "it is incumbent upon the trial court to determine whether the State has met its burden of showing that the delay was necessary under the circumstances of the particular case." *Id.*

We are concerned here with one narrow issue: Did the State sustain its burden of proving that the eight and one-half hour delay in this case was a necessary one? If it did not, the statements were inadmissible.

In this regard, and as a preliminary comment, it is evident that the court erred in its conclusion that "the *Johnson* Doctrine is strictly for cases which approach the outer limits of twenty-four hours. . . ." That is not at all what the Court of Appeals said, or implied, or intended.

Not every delay, of course, will suffice to render intervening statements inadmissible, only those that are "unnecessary." In *Johnson*, the Court gave as examples of "necessary" delay those required:

> . . . 1) to carry out reasonable routine administrative procedures such as recording, fingerprinting and photographing; 2) to determine whether a charging document should be issued accusing the arrestee of a crime; 3) to verify the commission of the crimes specified in the charging document; 4) to obtain information likely to be a significant aid in adverting harm to persons or loss to property of substantial value; 5) to obtain relevant nontestimonial information likely to be significant in discovering the identity or location of other persons who may have been associated with the arrestee in the commission of the offense for which he was apprehended, or in preventing the loss, alteration or destruction of evidence relating to such crime. *Supra,* at 329.

It would be specious to suggest that the delay in this case was for any of those reasons, or for a reason similar to them. Porter was not "processed" or held pending the imminent reception of other material evidence. Knowing that November 10 was a holiday, and that Commissioner Barber would only be available until about 10:00 a.m., the police held Porter in his cell seemingly to circumvent the Rule and create an opportunity to interrogate the prisoner in clear derogation of its requirements.

The trooper testified as follows:

Q. Now, prior to your discussion with him at 10:15, what if any effort did you make when

you arrived at the Frederick Barracks to take Mr. Porter before a commissioner for a hearing?

A. This particular date was a Court Holiday, 10th of November, and I knew that a Commissioner should be at the Courthouse at approximately 9:00 a.m. I asked TFC Herring to make a phone call and to locate a commissioner. He later reported to me he was unable to ccntact the Commissioner, later being in approximately 15 or 20 minutes. . .

Q. You testified that you received a call from Commissioner Barber that morning?

A. Yes sir.

Q. Was Commissioner Barber returning a call of yours or was he just calling the MD. State Police Barracks?

A. He was just calling the Barracks.

Q. Does he normally do that as a routine matter?

A. Yes, all of them do that as a routine matter, and the purpose for that is to find out if you have anybody there that needs to be presented to a Commissioner.

Q. And did you tell Commissioner Barber that you did in fact have Mr. Porter in custody?

A. Yes (It should be noted here that Commissioner Barber signed the arrest and search warrants and was fully apprised that the warrants would probably be executed on November 10th) . . .

Q. When you arrested Mr. Porter on November 10th at 8:00 . . . was it your intention then to interrogate him about the crime?

A. My normal procedure after I arrest somebody is to talk to them, yes sir. . .

Q. How long has the Maryland State Police used the waiver of prompt presentment form?

A. It hadn't been too awfully long, probably within 2 months of that time that the form came into being.

Q. Were there any instructions given to the Maryland State Police Officers as to when this form is to be used and under what circumstances?

A. Yes sir.

Q. Could you tell me briefly what that instruction is?

A. Basically when the subject is placed under arrest, he's in custody it should be read to the subject prior to any questioning if you don't take him to the Commissioner immediately.

Q. Well, aren't you supposed to take him to the Commissioner immediately?

A. I don't really understand what you're asking . . .

Q. Why was it that Mr. Porter was not processed immediately when you returned him to the Frederick Barrack?

A. I saw no need to process him right at that time.

Q. You mean you didn't photograph or fingerprint him or in any way get ready to have him presented to the commissioner or to have bond set, did you?

A. I don't have to in a situation such as this. I knew that he would not be getting out on bond and I was in no particular rush as far as preparing him . . .

We view the above as flagrant disregard for the rights of an accused while under the coercive conditions of custodial interrogation. It is the clearest example of the very type of police misconduct intended to be deterred by M.D.R. 723. That November 10 was a holiday, under the circumstances of this case, is an absolute irrelevancy. A commissioner was

available, and there was no justification whatsoever for not presenting appellant before him.

Accordingly, we find that any statements by the defendant in the instant case prior to the presentment should have been ruled inadmissible against him as part of the prosecution's case-in-chief.

To determine whether statements made after presentment were admissible, the Court must make an independent evaluation of all the circumstances surrounding the statement including, but not limited to, the time, place and manner of its taking, intervening events, its content compared to prior statements given, and any other factors that will lead to a determination of whether the post-presentment statement was a product of free will and deliberate reflection and therefore free from the taint of the preceding illegal detention. *Johnson, supra,* at 330, *Meyer v. State,* 43 Md. App. 427, 438 (1979). The burden for this proof rests on the State. *Kennedy v. State,* 44 Md. App. 662, 665-67 (1980).

There really can be little doubt as to the taint in this case. After giving two severely incriminating statements concerning his possession of the victim's wallet and the location in his home of the murder weapon, the third statement, taken three hours later can hardly be considered as free from the taint of the illegal detention that preceded it. It was inadmissible.

For the guidance of the trial court upon remand, we shall also address, and note our agreement with, appellant's contention that the gun, located in appellant's home as the result of his unlawfully obtained statements, was also inadmissible. It is not necessary to consider appellant's final complaint, which has to do with the sentence he received.

> *Judgments reversed; case remanded for new trial.*
> *Costs to be paid by Anne Arundel County.*

*Moylan, J., concurring:*

Reluctantly, I concur. I wish that I were in a position to dissent, but I am precluded by Maryland Rule 1085 because what for me is the weak link in the appellant's argument was not challenged by the State below or, indeed, even on this appeal. I cannot quarrel with the logic of the majority opinion; it follows dutifully from *Johnson v. State,* 282 Md. 314, 384 A.2d 709. Nor do I take this occasion to quarrel with *Johnson v. State* itself (although I believe that the dissenting opinions of Chief Judge Murphy and of Judge Orth, each joined in by the other and both joined in by Judge Smith, represent far sounder reasoning and far more realistic policy). My quarrel is with Maryland District Rule 723 a itself. It for me is a nullity as being an *ultra vires* exercise of a limited rule-making function. If appropriately challenged, I think any trial judge in the State should promptly declare it null and void as beyond the power of the rule-making authority.

To me, the transcendant issue, shorn of legal embellishment and reduced to its lowest common denominator, is simple:

A killer stupidly confessed to a murder and now wishes that he had kept his mouth shut. So what? Should we be distressed or should we be glad?

The confession in issue was not involuntary. It did not offend the Fifth Amendment privilege against self-incrimination. It did not offend the even more stringent implementing rules of *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694. It would have passed muster even during the heyday of the Warren court. It was constitutional under both the United States Bill of Rights and Article 22 of the Maryland Declaration of Rights, always held to be *in pari materia* with the Federal Fifth Amendment privilege.

What then is the basis for throwing out highly probative, competent, relevant and material evidence that could play a pivotal role in bringing a killer to book and in protecting society from his possible future depredations? It is on the

basis of a rule promulgated under a grant of authority permitting the passage of rules ostensibly to regulate the orderly flow of business within a court house. My question could not be more basic. In our form of government, whoever gave the rule makers the supposed power to make such rules? For me, what has been done is not rule making but law making. Upon that distinction hinges everything.

The rule-making authority here in issue ultimately flows from Article IV, Section 18 (a) of the Maryland Constitution:

"The Court of Appeals from time to time shall make rules and regulations to revise the practice and procedure in and the administration of the appellate courts and in the other courts of this State, which shall have the force of law until rescinded, changed or modified by the Court of Appeals or otherwise by law."

The question is what is rule making and what are its limits? Even the constitutional grant of rule-making authority recognizes the tentative nature of such authority and sets forth explicitly the power of the Legislature to supersede or override such rules at any time. The interpreting cases recognize that rule making is legislative in nature, *Ginnavan v. Silverstone,* 246 Md. 500, 505, 229 A.2d 124; *Hill v. State,* 218 Md. 120, 127, 145 A.2d 445, and that sometimes courts are authorized to perform functions which are not essentially judicial, *Boyer v. Thurston,* 247 Md. 279, 293-296, 231 A.2d 50.

Indeed, in *Kohr v. State,* 40 Md. App. 92, 388 A.2d 1242, Judge Liss for this Court recognized that the rules are not "sacred cows" but are subject to probing examination to see if they fall within the legitimate parameters of rule making. In that case, he held that Maryland Rule 736 passed muster but, in doing so, pointed out the fundamental purpose of rule making and one of the limitations upon it, saying at 40 Md. App. 96:

"The basis for the grant of this rule-making

power is the recognition that in order to provide for the orderly administration of justice reasonable and specific rules of procedure are necessary. The rule-making power, like all legislative power, must be exercised within the confines of the United States Constitution and our own Constitution."

Even more fundamental limitations upon the rule-making function are at stake here. When do rule makers exceed their limited grant of power? When does mere rule making, sometimes legitimately delegated to the executive and judicial branches of government, pass imperceptibly into law making and become thereby an unconstitutional usurpation of the legislative prerogative? The very foundation upon which our system of government is erected is the scrupulous and jealously guarded separation of powers. The starting point for any consideration of the limits of the rule-making authority is Article 8 of the Maryland Declaration of Rights:

"That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."

It is not infrequent that the Legislature (or in this case Article IV, Section 18 (a) of the Constitution itself) sensibly declines to inundate itself with the minutiae of infinitely detailed and ever-changing departmental and bureaucratic regulations, and thus delegates to the appropriate agency the limited grant of power to promulgate such regulations for the orderly doing of business before that agency. This is all that the grant of authority under Article IV, Section 18 (a) historically was ever contemplated to represent. Indeed, Section 1-201 of the Courts and Judicial Proceedings Article, implementing the constitutional grant, makes its nature crystal clear as it catalogues the concerns that fall within its compass.

"Without intending to limit the comprehensive application of the term 'practice and procedure', the

> term includes the forms of process; writs; pleadings; motions; parties; depositions; discovery; trials; judgments; new trials; provisional and final remedies; appeals; unification of practice and procedure in actions at law and suits in equity, so as to secure one form of civil action and procedure for both; and regulation of the form and method of taking and the admissibility of evidence in all cases, including criminal cases."

The power to control the paper flow of litigation, to decide what pleadings shall be filed in what places, at what times, and in how many copies, does not remotely contain within it, and constitutionally cannot contain within it, the broad power to supervise the operation of the criminal justice system. It is the executive branch that is responsible for the behavior of its agents. It is for the legislative branch, representing directly the voice of the people and accountable to the people, to make the fundamental policy judgments as to what, at the sub-constitutional level, our law enforcement system should be all about.

Constitutional protections, to be sure, override both executive prerogative and legislative prerogative, but we are talking here about matters at the distinctly sub-constitutional level. At that sub-constitutional level, it is not the business of the judicial branch to make or to suggest policy, but only to implement and interpret the policy as made by others. At the sub-constitutional level, it is not for the judicial branch to supervise or to dictate the behavior of the executive arm. At the sub-constitutional level, it is not for the judicial branch to create for defendants rights or liberties which it believes desirable. At the sub-constitutional level, that delicate balancing between efficient law enforcement, on the one hand, and extra-constitutional protections, on the other hand, is quintessentially legislative in nature.

In this regard, it is the legislative branch that has the benefit of hearing from all constituent groups. It is the legislative branch that is best equipped to study the impact of a

proposed change. Of even more overriding concern, it is the legislative branch that expresses the popular will.

The Constitution itself, to be sure, is a curb on the popular will. Indirectly, therefore, power rests in the judicial branch to curb the popular will just so long as the judges are interpreting the Constitution. Without that jurisdictional basis for action, however, the judges are required simply to serve that popular will, as expressed through the legislative branch. Why have bar associations, editorial writers, legislators and concerned citizens been so unalert to usurpation on the part of one branch of government of the sovereign prerogative of a coordinate branch of government? It is, I submit, because we have grown so used to deferring to the judicial branch at the level of interpreting the Constitution, where such deference is appropriate, that we have been lulled by habit into deferring to the judicial branch even at the sub-constitutional level, where such deference is dangerously inappropriate.

In our system of checks and balances, the judicial branch, by its very nature, is and is supposed to be the anti-democratic branch. It is the appropriate "brake" upon the process; it is a very inappropriate innovator of the process.

To presume to tell the police department how to do its business, to presume to create (even from the noblest of motives) extra-constitutional rights in a criminal defendant, is to engage in substantive law making in the guise of rule making. The issue here is not whether Maryland District Rule 723 a is a good law or a bad law. That is a mere surface concern. The far more fundamental issue is that of who, in a democratic society, shall pass such a law, good or bad.

A benevolent oligarchy can be as anti-democratic as a power hungry executive and even more insidious because of low visibility. If eternal vigilance is the price of liberty, the legislative branch of government might be well advised to keep a weather eye to both its flanks.

Whatever the merits of this particular case, there is involved here a far deeper, far more profound issue that

110

desperately cries out for public attention, public concern and public debate — What are the limits of the rule-making function? A haunting refrain from the musical "1776" echoes still:

"Is anybody there? Does anybody care?"
Only time will tell.