13 A.3d 1227

Alexander H. NEUSTADTER, et al.

v.

**HOLY CROSS HOSPITAL OF SILVER SPRING, INC.**

**No. 12, Sept. Term, 2010.**

Court of Appeals of Maryland.

Feb. 24, 2011.

**232**

Thomas J. Mack (University of the District of Columbia, David A. Clarke School of Law, Washington, D.C.) (Rene Sandler of Sandler Law LLC, Rockville, MD; Stephen B. Mercer of Stephen B. Mercer, Esq., P.C., Rockville, MD), on brief, for petitioners.

Michelle R. Mitchell (David A. Levin of Wharton, Levin, Ehrmantraut & Klein, P.A., Annapolis, MD), on brief, for respondent.

Abba Cohen, Esq., Jenny Figa, Esq., Agudath Israel of America, Washington, D.C., Steven A. Loewy, Esq., Germantown, MD, for Amicus Curiae brief of Agudath Israel of America in Support of Petitioners.

Kenneth Lasson, Esq., Professor of Law, University of Baltimore, Baltimore, MD, for Amici Curiae brief of Interested Professors of Law in Support of Petitioners.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

GREENE, J.

Petitioner ("Mr. Neustadter") appeals from a judgment of the Circuit Court for Montgomery County and asserts that his constitutional right to the free exercise of his religion was infringed by rulings denying a two-day postponement or recess during his medical malpractice case so that he could

observe an Orthodox Jewish holiday. The trial judge and County Administrative Judge collectively denied four motions for postponement of the case. We hold that the judges abused their discretion in denying the requests for a continuance of the trial where the movant's religious beliefs prohibited any appearance or advocacy on his behalf in the pending civil court proceeding. Therefore, we reverse and remand for a new trial.

## FACTS AND PROCEDURAL HISTORY

Petitioner filed a complaint in the Circuit Court for Montgomery County against Capital Internal Medicine, LLC, Dr. Ahmed Nawaz, MD, and Holy Cross Hospital of Silver Spring ("Holy Cross") alleging negligent medical care of his father, Israel Neustadter, who died on March 27, 2003.[1] On October 20, 2006, the Circuit Court scheduled the case for a ten-day trial to commence on February 11, 2008. At a pre-trial hearing on January 24, 2008, the trial judge rescheduled the ten day trial, on a motion to continue by Respondent, to begin instead on June 2, 2008.[2] In addition, the trial judge appointed a Special Master to resolve ongoing discovery disputes.

Between January and May, 2008, counsel for the parties communicated on several occasions about an anticipated scheduling conflict due to Petitioner's anticipated religious observances, which would fall on the fifth and sixth days of the, then, ten-day trial. Subsequently, on May 6, 2008, Petitioner filed a "Motion to Suspend Trial Days for Religious Holidays"[3,4] ("May 6th motion") stating in pertinent part:

---

1. Capital Internal Medicine, LLC and Dr. Ahmed Nawaz, MD, were dismissed from the suit on October 16, 2006, and May 22, 2008, respectively, leaving Respondent, Holy Cross Hospital, as the sole defendant in the underlying trial.

2. Although the date entered in the record was June 2, 2008, all parties understood that trial would actually begin on June 3, 2008. On May 23, 2008, the trial judge notified the Assignment Office that trial would begin on June 3, 2008, and had been reduced to nine days.

3. In his first postponement motion entitled, "Motion to Suspend Trial Days for Religious Holidays" ("May 6th motion"), Petitioner drew the

Mr. Neustadter is an Orthodox Jew who is one of the most observant followers of Jewish principles and requirements.

*During Shavous he is (1) prohibited from doing any work including attending trial on these days [June 9 and 10, 2008] and (2) his attorney is prohibited, as his agent, from doing work on his behalf* .... On the Sabbath, Orthodox Jews ... strictly observe the requirement that work is prohibited ... and an agent is also prohibited from doing work on his behalf.

Petitioner's motion also summarized the attempts that had been made with opposing counsel to resolve the scheduling conflict without the intervention of the court. Dr. Nawaz opposed the motion. In his opposition motion, Dr. Nawaz suggested that rather than suspend the trial, if the trial court was "inclined to accommodate Plaintiff's religious beliefs, the entire case should be continued to a future date where any conflicting religious commitments can be known in advance and avoided." An order denying Petitioner's first motion was entered May 7, 2008. Subsequently, Petitioner raised the scheduling conflict at a discovery hearing on May 14, 2008, at which point Respondent expressed an interest in maintaining the current trial schedule. The trial judge denied Petitioner's request to alter the trial schedule. At that hearing, Petitioner notified the court that he would file a motion to reconsider.

---

trial court's attention to the parameters of the Orthodox Jewish Holiday described by the Orthodox Union website at http://www.ou/org/calendar/2008.htm:

Shavuot
6 Sivan—Israel (6 & 7 in Diaspora)
Moses Receives The Torah (Pentecost)—Celebrating G-d's giving of the Torah and Ten Commandments to the Jews at Mt. Sinai. Memorial (Yizkor) services said (on 2nd day in diaspora).
**Work Restrictions: Sabbath-like work restrictions one day in Israel—two days in Diaspora.**

4. The May 6th motion provided the first notice to Respondent and to the trial court that counsel for Mr. Neustadter was also prohibited from being present in court on June 9th and 10th because as an agent he was prohibited from doing work on Mr. Neustadter's behalf.

On May 19, 2008, Petitioner filed a second postponement motion entitled, "Motion to Reconsider Motion to Suspend Trial Days for Religious Holidays." Petitioner reiterated his argument from the May 6th motion and submitted an affidavit from the Assistant Rabbi of his congregation citing the specific prohibitions of the Sabbath and concluding that it would be impossible for either Petitioner, or his attorney, to participate in any way in a legal proceeding on June 9th and 10th. Furthermore, Petitioner contended that conducting his trial on the Sabbath violated his First Amendment Rights, that he had a right to attend and appear at trial, and that he would be prejudiced if the trial were held in his absence. When the Motion to Reconsider was discussed at the pre-trial hearing on May 22, 2008, Petitioner asked the court to consider the "constitutional issues . . . when deciding not to honor somebody's religious requirements." The Motion to Reconsider was denied.

On June 2, 2008, the day before trial was to begin, Petitioner filed a third "Motion to Postpone Trial for Religious and Fairness Reasons," which was opposed by Respondent. Petitioner stated two grounds for the motion: (1) prejudice and (2) fairness because of an earlier accommodation to Respondent. Petitioner stated in the motion:

> This case was rescheduled on January 24, 2008 . . . due to pending discovery matters and other issues that still had to be resolved. . . . At that time, the Plaintiff consented to the postponement.

> At that time, it was about two weeks before trial when the defense attorneys' scheduling problem was raised for the first time at the pretrial conference.

Respondent opposed the Motion to Postpone arguing that the court had already denied Petitioner's request on three occasions, that there was no mention at the January pre-trial conference of a scheduling conflict, and that only one of their four expert witnesses could be rescheduled to testify on June 11th. The Administrative Judge denied the Motion to Postpone.

On June 3rd, before the trial judge, Petitioner raised the issue of postponement "one more time." The trial judge declined to postpone the trial stating, "[w]e've addressed that issue numerous, this issue, particular issue, numerous times and I have explained numerous times why the case is not going to be continued or suspended and that's really the ruling of the case at this point. So I have to deny the motion."

The trial began on June 3, 2008. Petitioner presented his case, which consisted of 13 witnesses, from June 3rd through June 6th. At the conclusion of Mr. Neustadter's case on June 6, 2008, Holy Cross moved for judgment, which the court denied. After the jury was dismissed for the day, the trial judge asked Mr. Neustadter's counsel, "[i]t's my understanding you're not going to be here [on Monday]?" Counsel for Petitioner responded affirmatively and then objected to the trial continuing on Monday and Tuesday. Court proceedings were set to begin mid-morning on Wednesday so that Petitioner could listen to a recorded transcript of the trial proceedings. The parties also discussed that a defense witness, Dr. Geckler, who had previously agreed to move his appearance to Wednesday, would actually testify on Monday.

On Monday and Tuesday, June 9 and June 10, 2008, in Mr. Neustadter's absence, Holy Cross Hospital put on its entire case-in-chief, which included the testimony of four expert witnesses and one of Israel Neustadter's treating physicians, all offered to refute the Hospital's liability for damages. On June 9, 2008, Holy Cross offered the testimony of Dr. Richardson, qualified as an expert in geriatric and family medicine, and of Dr. Geckler, qualified as an expert witness in internal medicine and infectious disease. On June 10, 2008, Holy Cross introduced the testimony of Dr. Ball, one of the treating critical care pulmonologists for Israel Neustadter; Ms. McMullen, qualified as an expert in the field of nursing; and Dr. Goldstein, qualified as an expert in internal medicine, pulmonary medicine, and critical care medicine. In addition to offering the testimony of the witnesses mentioned, Holy Cross offered as physical evidence a manual on nursing ethics and the curricula vitae for those experts who testified. After-

wards, Holy Cross rested its case. On June 11, 2008, Mr. Neustadter and his counsel appeared at trial. That day the jury returned a verdict in favor of Holy Cross.

Petitioner appealed the judgment of the Circuit Court asking the intermediate appellate court to consider three questions related to: a possible violation of his right to religious freedom and right to be present at trial; error in refusing to submit a claim of administrative negligence to the jury; and error in refusing an instruction on negligence *per se.* In an unreported opinion, the Court of Special Appeals affirmed the trial court's judgment holding, in pertinent part, that there was no constitutional violation of Petitioner's right to free exercise of religion, stating:

> Given appellant's delay in alerting the court to the conflict with trial on June 9–10, and given the scheduling conflicts that existed at the time appellant made his requests, as well as counsel's failure to suggest any other options, we find no error in the trial court's ruling denying the requests for a postponement of the trial.

We granted certiorari, *Neustadter v. Holy Cross Hosp.*, 412 Md. 494, 988 A.2d 1008 (2010), to consider the following question, which we have reworded slightly for clarity:

> Whether the trial court's denial of Petitioner's request to suspend a civil trial for two days that Petitioner's Jewish Orthodox faith required him to strictly observe as days of worship violated Petitioner's constitutional right to free exercise of his religion.

## I.

Petitioner urges this Court to scrutinize strictly the trial court's rulings by positing that his right to engage in religious conduct, protected by the Free Exercise Clause of the First Amendment to the United States Constitution, was impermissibly infringed.[5] Conversely, Respondent maintains that we should apply an abuse of discretion analysis because the trial

---

5. Mr. Neustadter urges this Court to scrutinize strictly the case pursuant to either: (1) the balancing test of government conduct as weighed

court's rulings were discretionary and had no constitutional implications. The intermediate appellate court explicitly declined to apply any particular standard of review stating, "[w]e need not decide the applicable standard. Even applying the higher standard advocated by appellant, we find no error." [6]

■ Ordinarily,

[i]n reviewing a possible violation of a constitutional right, this Court conducts its own independent constitutional analysis. *See Crosby v. State*, 366 Md. 518, 526, 784 A.2d 1102, 1106 (2001) ("[W]hen the issue is whether a constitutional right has been infringed, we make our own independent constitutional appraisal"). "We perform a de novo constitutional appraisal in light of the particular facts of the case at hand. . . ." *Glover v. State*, 368 Md. 211, 221, 792 A.2d 1160, 1166 (2002).

*State v. Davis*, 415 Md. 22, 29, 997 A.2d 780, 784 (2010). Although the issue, briefs and oral argument in this case directed our attention to the various tests employed by the

---

against the "substantial burden" imposed upon an individual espoused by the Supreme Court in *Sherbert v. Verner*, 374 U.S. 398, 410, 83 S.Ct. 1790, 1797, 10 L.Ed.2d 965, 974 (1963), in which the Court held that a state had no compelling interest in imposing a statute that substantially infringed upon a Seventh Day Adventist who was denied unemployment benefits upon a refusal to accept Sabbath day employment; or alternatively, according to the "hybrid rights" theory espoused in *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 881, 110 S.Ct. 1595, 1601, 108 L.Ed.2d 876, 887 (1990), in which the Court held that a neutral and generally applicable criminal law is applicable even if it imposes a burden upon religious conduct and noting that the only cases in which the Court has struck down such a law was when other constitutionally protected rights were contemporaneously infringed, i.e. "freedom of speech and of the press . . ., or the right of parents to direct the education of their children."

6. The Court of Special Appeals used a test that Petitioner asserts and we agree was a "free-floating balancing test," which apparently combined elements of a constitutional analysis with those of an abuse of discretion analysis. That court held that Petitioner's religious beliefs were sincere and caused a bona fide conflict, nevertheless it held that the trial court had a compelling interest in the "efficient and orderly administration of justice," the tardiness of Petitioner's request "weighed against" him, and that the trial court had no ability to adjust its schedule to accommodate the request.

United States Supreme Court upon claims of violations of the Free Exercise Clause of the First Amendment, we conclude that the issue presented here, i.e., the propriety of repeatedly denying Petitioner's motions to suspend and/or postpone his civil trial, can be resolved without reaching the constitutional question.[7] Therefore, our task is to determine whether the trial court abused its discretion in denying Petitioner a reasonable accommodation when his religious beliefs directed that he and his attorney refrain from any form of advocacy during the two days of the Jewish Orthodox Holiday of Shavuot that fell in the period scheduled for his civil trial.

## II.

Md. Rule 2–508 states that, "[o]n motion of any party or on its own initiative, the court may continue a trial or other

---

7. "[T]his Court has regularly adhered to the principle that we will not reach a constitutional issue when a case can properly be disposed of on a non-constitutional ground." *In re Julianna B.*, 407 Md. 657, 667, 967 A.2d 776 (2009) (quoting *State v. Lancaster*, 332 Md. 385, 403 n. 13, 631 A.2d 453, 463 n. 13 (1993) (declining to consider the constitutionality of actions by defendants when the case was found to be moot)); *Montrose Christian Sch. Corp. v. Walsh*, 363 Md. 565, 578, 770 A.2d 111, 119 (2001); *Baltimore Sun v. Baltimore*, 359 Md. 653, 659, 755 A.2d 1130, 1133–1134 (2000). Moreover, because the Supreme Court has not addressed the impact of its *Smith* decision, *supra* note 6, on judicial determinations such as the one in the instant case, there is no applicable constitutional precedent that must be applied in this case. At least one of our sister states has applied a strict scrutiny analysis to discretionary judicial rulings even after the apparent limitation on that analysis as enunciated by the *Smith* Court. Given that it is unclear how *Smith* impacts such discretionary rulings, we prefer to resolve this case according to well-settled Maryland non-constitutional law relating to Md. Rule 2–508 (Continuances). *See, e.g., People v. Farrell*, 28 A.D.3d 244, 812 N.Y.S.2d 101, 102 (2006) (holding that the court had a "legitimate and compelling interest in completing the trial without the requested weekend adjournment" that defendant made in order to observe Jewish Sabbath); *People v. Gilliam*, 215 A.D.2d 401, 626 N.Y.S.2d 245, 245 (1995) (holding that a defendant's request to adjourn court proceedings to observe Muslim Sabbath was "improperly denied in that no compelling State interest was shown"); *People v. Williams*, 197 A.D.2d 401, 602 N.Y.S.2d 377, 378 (1993) (holding that defendant's request for a Friday adjournment to attend religious services properly denied because the proceeding was an incidental burden, justified by the compelling interest of the state to insure a fair trial where the jury had been sequestered for two days).

proceeding as justice may require." Generally, an appellate court will not disturb a ruling on a motion to continue "unless [discretion is] arbitrarily or prejudicially exercised." *Dart Drug Corp. v. Hechinger Co.*, 272 Md. 15, 28, 320 A.2d 266, 273 (1974) (finding no abuse of discretion in denying a motion where there was an "eleventh hour" request to continue a 26 month trial). This Court recently reiterated that the "decision to grant a continuance lies within the sound discretion of the trial judge." *Touzeau v. Deffinbaugh*, 394 Md. 654, 669, 907 A.2d 807, 816 (2006) (noting in footnote five that the legislative history of Md. Rule 2–508 and the judicial discretion to consider such motions dates back to 1787). We have also affirmed that the trial court has authority over the management of its trial docket. *Goins v. State*, 293 Md. 97, 111, 442 A.2d 550, 557 (1982) (stating "[e]xcept as limited by statute or rule, a trial court has inherent authority to control its own docket").

■ Appellate courts do not defer to discretionary rulings of the trial judge, however, when the judge has resolved the issue on 'unreasonable or untenable' grounds. We have stated:

> We have defined abuse of discretion as "discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *Jenkins v. City of College Park*, 379 Md. 142, 165, 840 A.2d 139, 153 (2003) (emphasis not included). *See also Garg v. Garg*, 393 Md. 225, 238, 900 A.2d 739, 746 (2006) ("The abuse of discretion standard requires a trial judge to use his or her discretion soundly and the record must reflect the exercise of that discretion. Abuse occurs when a trial judge exercises discretion in an arbitrary or capricious manner or when he or she acts beyond the letter or reason of the law.") (quoting *Jenkins v. State*, 375 Md. 284, 295–96, 825 A.2d 1008, 1015 (2003)).

*Touzeau*, 394 Md. at 669, 907 A.2d at 816.

■ In exercising discretion, the trial court must apply the correct legal standard in rendering its decision:

[W]here the record so reveals, a failure to consider the proper legal standard in reaching a decision constitutes an abuse of discretion.

\* \* \*

The "abuse of discretion" standard of review is premised, at least in part, on the concept that matters within the discretion of the trial court are "much better decided by the trial judges than by appellate courts...." So long as the Circuit Court applies the proper legal standards and reaches a reasonable conclusion based on the facts before it, an appellate court should not reverse a decision vested in the trial court's discretion merely because the appellate court reaches a different conclusion.

*Aventis Pasteur, Inc. v. Skevofilax,* 396 Md. 405, 433, 436, 914 A.2d 113, 130–32 (2007) (citations omitted) (holding that a trial judge did not abuse his discretion in denying a motion for voluntary dismissal without prejudice because the judge considered the proper legal standard as defined by Maryland case law, namely that there was no conflict of interest, fraud, or neglect by a party moving on behalf of a minor). In *Edwards v. State,* where we undertook an analogous challenge, we stated that "the ultimate decision, assuming the application of correct principles of law in the balancing process, is a discretionary one with the trial court ..., we look to see whether the court applied correct legal principles and, if so, whether its ruling constituted a fair exercise of its discretion." 350 Md. 433, 441–42, 713 A.2d 342, 346 (1998) (internal citations omitted) (holding that there was no abuse of discretion in denying a defendant's motion for disclosure of the identity of a confidential informant after an appropriate balancing test which did not run afoul of defendant's constitutional rights). Thus, here, we must consider whether the interests of the court and the Petitioner were properly balanced.

This Court has consistently affirmed denials of motions to continue when litigants have failed to exercise due diligence in preparing for trial, in the absence of unforeseen circumstances to cause surprise that could not have been reasonably mitigat-

ed, where untimely requests were made, where procedural rules were ignored, where attorneys failed to adequately prepare for trial, where a witness was missing, and where a litigant's chosen counsel was absent but alternative counsel was available. *See Touzeau*, 394 Md. 654, 678, 907 A.2d 807, 821 (2006) (finding no abuse of discretion when the trial court denied a request to continue where a self-represented litigant did not exercise due diligence to obtain counsel until five days before trial and failed to demonstrate that hardship in obtaining counsel was an unanticipated event); *Dart Drug Corp.*, 272 Md. at 28, 320 A.2d at 273 (finding no abuse of discretion where there was an "eleventh hour" request to continue a 26 month trial); *Abrams v. Gay Inv. Co.*, 253 Md. 121, 124, 251 A.2d 876, 878 (1969) (finding no abuse of discretion where a party failed to follow court procedural rules); *Cruis Along Boats, Inc. v. Langley*, 255 Md. 139, 142–44, 257 A.2d 184, 186 (1969) (finding no abuse of discretion where an unavailable lead attorney could be replaced with associate counsel at trial).

In contrast, this Court has found reversible error in the denial of a motion to continue in certain circumstances:

We have found that it would be an abuse of discretion for a trial judge to deny a continuance when the continuance was mandated by law, *see Mead v. Tydings*, 133 Md. 608, 612, 105 A. 863, 864 (1919), or when counsel was taken by surprise by an unforeseen event at trial, when he had acted diligently to prepare for trial, *Plank v. Summers*, 205 Md. 598, 604–05, 109 A.2d 914, 916–17 (1954), or, in the face of an unforeseen event, counsel had acted with diligence to mitigate the effects of the surprise, *Thanos v. Mitchell*, 220 Md. 389, 392–93, 152 A.2d 833, 834–35 (1959).

*Touzeau*, 394 Md. at 669–670, 907 A.2d at 816. The intermediate appellate court has also reversed a denial of a motion to continue when a wife sought more time to obtain counsel in a contentious and complex divorce proceeding, *Reaser v. Reaser*, 62 Md.App. 643, 650, 490 A.2d 1315, 1319 (1985), and when a mother could not attend a custody hearing because the child whose welfare was in issue was ill, *In re McNeil*, 21 Md.App. 484, 499–500, 320 A.2d 57, 66 (1974).

■ We hold that the trial judge abused her discretion in denying the May 6th Motion and discretion was unreasonably exercised with regard to Petitioner's three subsequent pleas for a suspension of the proceeding, and finally for a postponement on May 16, June 2, and June 3, 2008, because the articulated rationales, discussed *infra*, failed to reasonably accommodate Petitioner's right to engage in religious conduct and to meaningfully participate in his trial. In this case, the absence of the plaintiff and his counsel from trial could not have been and indeed was not meaningfully mitigated. Moreover, Petitioner's notice to the court and opposing counsel of the scheduling conflict was not so untimely as to preclude accommodation or indicate an utter lack of diligence.

## III.

In the instant case, the trial judge concluded that Petitioner's repeated request to suspend trial for two days was impossible to accommodate in light of the court's interest in the orderly administration of the court proceedings. Essentially, the court's reasons included: lack of approval from the County Administrative judge, inconvenience to jurors and witnesses, prior rescheduling,[8] double-booking the judge and defense counsel for a speculative third week of trial, untimeliness of Petitioner's first motion, a crowded trial docket, and that the court was "down two judges." In our view, these rationales do not indicate the impossibility of offering a reasonable accommodation to Petitioner and therefore the decision misses the mark and implicates prejudice to the movant.

On May 14th, the trial judge stated:

[The] difficulty I have is, and I did discuss this with our administrative judge before I ruled on that motion, is that when this trial date was set in February this issue was not raised.

\* \* \*

---

8. Respondent moved for a continuance of the first trial date in order to resolve discovery issues and that request was granted at the pre-trial conference on January 24, 2008.

And I cannot, the administrative judge will not let me, hold up jurors for an extra two days because of something that was not brought to our attention. And the case has already been rescheduled once, and I simply cannot suspend the trial for those two days.

If we had depositions de bene esse that were already "in the can," as they say, or on film, we could play those and then it wouldn't matter. But I don't know that we do.

And, you know, our trial calendar is extremely heavy right now. I'm down two judges, and I'm simply not authorized to suspend the trial for two days. Because, it affects a lot of people not just us in ... this room, it affects the witnesses, but if affects jurors, members of the community, and the entire docket if I don't finish the trial within a time that's allowed for it. So, I cannot suspend the trial.

But you can file a motion to reconsider if you want, but I won't be suspending the trial.

At the pre-trial hearing on May 22, 2008, the trial judge considered Petitioner's Motion to Reconsider stating:

The concern, the Court's concern is that when this trial was scheduled to back in, I believe it was the end of January when a motion to continue the February trial date was discussed and this trial date was picked, there was, at that time, no request that this trial be suspended for two days. It was set for nine days to begin on Tuesday the 3rd. And had there been a request to suspend it for two days it would have been addressed when the trial was set. And either, if it couldn't be accommodated, you know, if that wasn't agreeable a different date would have been picked.

But the problem is that the request comes less than a month before trial in a very crowded trial docket for the court system itself, because we are short two judges. We are already having a lot of problems juggling trials and so forth, so it's very difficult on the Court. It also carries the trial over to next week for jurors who are greatly imposed on.

And it may seem like a relatively short trial to a federal court if they typically have six, eight, 14 week trials, but for a circuit court an eight, nine, 10 day trial is a long trial and it ties up a lot of, it ties up myself, it ties up all the courtroom personnel, it ties up a lot of people, but also jurors.

Not to mention ... expert witnesses.

Petitioner interjected:

Your Honor ... you'll recall that there was tremendous difficulty finding a date at all for the two defense firms, that they could not find when the primary counsel had to be here, and that was a date that was taken out of the only time frame that could be accepted. So the fact that is if you had known that an earlier date, I don't think there would have been an easier way to set this trial unless it was next year.

But the fact is that we did, and I laid out in my motion that I did contact pretty promptly, in February, the two defense firms and said to them, "Look, we got this problem, and here's what the problem is. Would you consent?" And I think I laid out the dates in my motion. And I got a response back from Mr. Ceppos [Counsel for Dr. Nawaz], and I, some time passed I had to contact Ms. Ward [Counsel for Holy Cross] again and she responded. And the fact is that, you know, we couldn't reach agreement on it.

With the, with the dropping of Dr. Nawaz from the case, this case is now going to be three or four days shorter.

Therefore, by extending this trial, by having a two-day, two days off it's really not going to be any longer than the original court trial schedule, was scheduled for anyway.

Petitioner maintained that June 9th and 10th could be removed from the trial calendar because the case was going to involve significantly fewer witnesses because of the dismissal of Dr. Nawaz. Respondent disagreed, stating, "I don't possibly see how Dr. Nawaz not being in this case is going to shorten this trial three to four days." The court restated its position from the first motion:

The motion to suspend was filed May 6th. And I don't know, I didn't look at when the e-mail correspondence started. There was some attached, I just didn't notice the date. But the motion itself as we got it May 6th was ruled on promptly, because I immediately called, after I realize that the defense counsel were saying their witnesses were lined up and couldn't consent I did immediately check with the administrative judge.

So, as of this point, it's still my position I do not have authority to suspend the trial for two days.

On May 22, 2008, the trial judge denied Petitioner's Motion to Reconsider.

On June 2, 2008, the Administrative Judge denied a third Motion to Postpone, without a hearing. Subsequently, the trial judge declined to postpone the trial upon an oral motion on June 3, 2008, stating, "[w]e've addressed that issue numerous, this issue, particular issue, numerous times and I have explained numerous times why the case is not going to be continued or suspended and that's really the ruling of the case at this point. So I have to deny the motion."

At the most, six jurors, possibly eight including two alternates, would have been asked to stand by, while trial proceedings were suspended for two days. This would not have been an unprecedented scenario. The double-booking issue similarly fails because there is no indication that the trial judge was specially assigned to hear the merits of this particular case, judges are double-booked not infrequently, and in the present case, another judge stepped in for the trial judge, to handle another medical malpractice case set for the same ten-day period as Petitioner's case.[9] The threat of a third week of

---

9. On January 24, 2008, the trial judge noted to counsel that there was another medical malpractice case beginning on June 9th:

> I have [another] case on my [docket] ... It's also a medical malpractice case ... scheduled to start at June 9th. *But we also double book cases all the time, too* .... It is double booking us for the following week, but apparently it's also double booking Ms. Kahn's [Dr. Nawaz's counsel] office.

trial does not follow from the facts of the case, which indicate that the trial was originally set for ten days, was then shortened to nine days because the trial judge would not be available on the first day, shortened further when Dr. Nawaz was dismissed from the suit on May 22, 2008 (along with an estimated 29 witnesses and substantial number of exhibits), and ultimately was completed in seven days. The record indicates that Petitioner did try to obtain the consent of defense counsel prior to bringing the conflict to the court's attention through e-mails dated January 28, April 22, April 23, and May 1, 2008. When no consent was given, Petitioner filed a motion with the trial court, approximately one month prior to the start of trial.

This Court is not unsympathetic to the need for trial courts to efficiently and effectively manage overflowing dockets and judicial resources. There is no evidence on the record, however, that suspending court proceedings for two days of a nine day trial would unreasonably or substantially burden the docket or squander resources. Pursuant to the record, the trial judge could have taken a two day break and resumed the proceedings on Wednesday, June 11, 2008, and still finished the trial by the end of the second week. We have indicated on prior occasions that if a request for a continuance is predicated upon a circumstance that may be "obviated within a brief period of time," then the fact that the trial may resume progress "within a reasonable, rather than a protracted, period of time is an important consideration in a continuance decision." *Touzeau*, 394 Md. at 671–72, 907 A.2d at 818 (citing *King v. Mayor of Rockville*, 249 Md. 243, 246, 238 A.2d 898, 900 (1968)).

---

Moreover, according to the trial transcript and docket entries, the trial judge was not specially assigned to the trial when the original trial date was set. At the pre-trial conference on January 24, 2008, the trial judge stated, "the assignment office doesn't have this on my calendar for that date [Feb. 11, 2008] and set in another trial recently on that same date . . . . I mean, we don't have to change the trial date, but it might affect whether they bring in another judge or not."

The only attempt at any alternate means for adapting the trial schedule to accommodate Petitioner was an ineffective attempt to reschedule Respondent's witnesses for June 11th when Petitioner would return to court. At the pre-trial hearing on May 22, 2008, Counsel for Holy Cross stated:

> Additionally, which my four experts, either three or four of them are scheduled for Monday and Tuesday. So, to say that it wouldn't affect anything is, is, frankly, not true. Even though I'm, I understand that there's not multiple defendants anymore, I still have experts that I've prepaid and prearranged with to be here to testify on those two days.

The trial judge then inquired:

> I would ask counsel if you can contact your expert witnesses to see if any of them are available to reschedule ... Wednesday or Thursday.... If enough witnesses were rescheduled so that we didn't need to sit either Monday or Tuesday I would then not sit.[10]
>
> \*    \*    \*
>
> But ... I can't do it the third week, either. [T]he Court's calendar is, I mean, I'm already, frankly, double booked the second week of this trial ... they are bringing another judge in to cover [another malpractice case]. But that's how, I mean, we're just double and triple booked every week.
>
> \*    \*    \*
>
> So it is important that this trial end that second week. But if defense counsel can reschedule any of their experts, I am asking them to attempt to do that.

On May 28, 2008, Petitioner wrote the trial judge stating that he and Respondent had communicated about rescheduling some of Respondent's expert witnesses, but only one of the

---

10. The trial judge also suggested that each party could take some depositions on video, *de bene esse,* and those could be presented to the jury by television.

four could possibly move. Ultimately, the defense did not move any of its witnesses.

The trial judge stated that her denials "had nothing to do with the fact" that the nature of the request was religious, which we accept. Taking an objective view of Petitioner's predicament, however, it is difficult to imagine that a trial court would have refused to accommodate a litigant or counsel who requested a continuance because of family or personal illness, or in order to observe a time of bereavement upon the death of a family member. We note an apt reflection by the intermediate appellate court in *In re McNeil* wherein that court stated, "myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to due process an empty formality." 21 Md.App. at 499, 320 A.2d at 66. The trial court did not give sufficient weight to the impact on Petitioner of being absent from trial for the Respondent's entire case-in-chief. Moreover, the court unreasonably juxtaposed the convenience of jurors, witnesses, and attorneys against Petitioner's request for a religious accommodation, prejudicially assigning more value to the former.

While the trial court has broad discretion under Md. Rule 2–508 to continue a trial, the facts of this case gave rise to an exceptional circumstance that warranted a continuance. *E.g. Thanos*, 220 Md. at 392, 152 A.2d at 834–35 (stating "[i]n some instances, however, refusal to grant a continuance has been held to be reversible error . . . We think the case before us is one of the exceptional instances where there was prejudicial error") (citation omitted). Under the circumstances of the present case, the trial court abused its discretion by failing to make a reasonable accommodation, given the exceptional circumstance raised by the movant, whereby both he and his counsel were prohibited from participating in court proceedings for two days as a result of an asserted and uncontroverted religious tenet.

## IV.

When an appellate court determines that a trial court has abused its discretion in ruling on a motion to continue, to

the prejudice of the movant, the appropriate appellate action is to overturn such a ruling. *Jackson v. State,* 214 Md. 454, 459, 135 A.2d 638, 640 (1957) (noting that a discretionary ruling on a motion to continue should not be disturbed absent a showing of abuse that was prejudicial to the movant); *see also Thanos,* 220 Md. at 392, 152 A.2d at 834–35; *Plank,* 205 Md. at 605, 109 A.2d at 917. Prejudice means an "error that influenced the outcome of the case." *Harris v. David S. Harris, P.A.,* 310 Md. 310, 319, 529 A.2d 356, 360 (1987) and cases cited therein.

Petitioner contends that prejudice should be presumed in the instant case because he was "wrongfully excluded" by the trial judge, citing our decision in *Safeway Stores v. Watson,* 317 Md. 178, 562 A.2d 1242 (1989). In *Safeway Stores,* we held that a corporate entity had a right under Md. Rule 2–513 to designate a representative to be in the courtroom and that the trial judge's exclusion of Safeway's expert designee was wrongful and presumptively prejudicial so that Safeway did not have to prove both error and the prejudice. 317 Md. at 184, 562 A.2d at 1245–46. Relying on our decision in *Safeway Stores,* we stated more recently that "[w]hat emanates from these cases is that there is a right of presence, that the right is not absolute, and that a determination of whether exclusion of a party constitutes sufficient prejudice, either presumed or actual, to warrant a new trial depends, to some extent, on the circumstances." *Green v. N. Arundel Hosp. Ass'n,* 366 Md. 597, 620, 785 A.2d 361, 375 (2001) (citing *Gorman v. Sabo,* 210 Md. 155, 122 A.2d 475 (1956)).

■ In the instant case, we hold that conducting the trial in Petitioner's absence was presumptively prejudicial and requires reversal.[11] Petitioner's absence from court is analogous to the "wrongful exclusion" in *Safeway Stores,* and pursuant to *Green,* while some exclusions are appropriate given the cir-

---

11. Because we conclude that prejudice is presumed in the instant case, we need not reach Petitioner's alternative argument that he was actually prejudiced because of the trial judge's comments to the jury, which arguably criticized Petitioner's two-day absence from trial.

cumstances of the case, others are reversible error. In essence, the trial court precluded Petitioner from effectively litigating his case when it created a circumstance in which Respondent presented its entire case in the Petitioner's absence. Moreover, upon the presumption of prejudice, the non-complaining party must prove that the error did not impact the outcome of the case, which Holy Cross has failed to do. *See e.g. Harris,* 310 Md. at 319–20, 529 A.2d at 361 (noting that an erroneous disqualification of an attorney must be shown, by the advantaged party, to have had no influence on the outcome of the case).

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR A NEW TRIAL. RESPONDENT TO PAY THE COSTS.**

HARRELL, MURPHY, and ADKINS, JJ., Concur.

HARRELL, J., concurring, in which MURPHY, J., joins.

I concur with the result reached in the Majority opinion, which reverses the judgment of the Court of Special Appeals. The Majority opinion, in response to Neustadter's argument, declines to analyze the Supreme Court's Free Exercise jurisprudence in determining the appropriate standard of review in the present case, invoking the principle that this Court ordinarily will not decide a constitutional issue when the case may be disposed of fairly on a non-constitutional ground. 418 Md. 231, 240 & n. 7, 13 A.3d 1227, 1232–33 & n. 7 (2011). The Majority is correct to do so. "Going rogue," however, I write separately for posterity to express my views as to the constitutional principles argued by Petitioner as his sole basis for reversal. In this way, a response of sorts to Petitioner's constitutional argument will appear in the Maryland Reports, albeit not one carrying the weight of precedent (but also not violating the Court's duty to honor the doctrine of constitutional avoidance). Moreover, I disagree with the Majority

opinion's analysis of what, on this record, constitutes the abuse of discretion warranting reversal.

## I.

### A Road Map of the Undulating Free Exercise Highway

*Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), is recognized generally as the case in which "the high court first fully articulated its modern free exercise clause jurisprudence...." *Smith v. Fair Employment & Hous. Comm'n*, 12 Cal.4th 1143, 51 Cal.Rptr.2d 700, 913 P.2d 909, 943 (1996); *see Sherr v. Northport–East Northport Union Free Sch. Dist.*, 672 F.Supp. 81, 90 (E.D.N.Y.1987) ("The Supreme Court formulated its modern approach to free exercise claims in its 1963 *Sherbert* decision."). In *Sherbert*, a claimant for unemployment benefits was denied benefits after being found ineligible under a South Carolina law requiring that, to be eligible for benefits, a claimant must be "able to work and ... [be] available for work," and that a claimant is ineligible if "he has failed, without good cause ... to accept available suitable work when offered him by the employment office or the employer...." *Sherbert*, 374 U.S. at 400–01, 83 S.Ct. at 1792, 10 L.Ed.2d at 968. South Carolina's Employment Security Commission ruled the claimant ineligible for unemployment benefits, reasoning that, because the claimant—a member of the Seventh–Day Adventist Church—was discharged by her employer for refusing to work on Saturday (her Sabbath), she failed to "accept available suitable work when offered [her] by ... the employer." *Sherbert*, 374 U.S. at 401, 83 S.Ct. at 1792, 10 L.Ed.2d at 968. The South Carolina Supreme Court rejected the claimant's contention that the statutory provisions impermissibly infringed upon her federal First Amendment rights under the Free Exercise Clause.

The Supreme Court's first task became determining "whether the disqualification for benefits imposes any burden on the free exercise of appellant's religion." *Sherbert*, 374 U.S. at 403, 83 S.Ct. at 1793–94, 10 L.Ed.2d at 970. Answer-

ing that question in the affirmative, the Court reasoned that the Commission's ruling "forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." *Sherbert,* 374 U.S. at 404, 83 S.Ct. at 1794, 10 L.Ed.2d at 970. After determining that the South Carolina statute infringed substantially on the claimant's Free–Exercise rights, the Court explained that, in order to pass constitutional muster, the State must demonstrate a compelling state interest in enforcing the eligibility provisions of the unemployment benefits statutes. *See Sherbert,* 374 U.S. at 406–07, 83 S.Ct. at 1795, 10 L.Ed.2d at 972. Ultimately, the Court concluded that the State made no such showing. *Id.* Thus, it has been observed that

> *Sherbert* required a two-step analysis in determining whether or not a statute, as applied to a particular individual, violated the First Amendment. First, the court must determine if the application of the statute constitutes an infringement upon the individual's religious liberty, and second, if an infringement exists, the court must then determine if it is justified by a "compelling state interest."

*State v. Shaver,* 294 N.W.2d 883, 890 (N.D.1980).

*Sherbert* is considered a landmark decision, as it is "the first case to assert that laws interfering with religiously motivated conduct must be analyzed under the compelling state interest test." Christopher L. Eisgruber & Lawrence G. Sager, *Mediating Institutions: Beyond the Public/Private Distinction,* 61 U. CHI. L.REV. 1245, 1277 (1994). Mere "interference," however, was not enough (under *Sherbert* ) to mandate application of the compelling state interest test. Rather, *Sherbert* became known for creating the "substantial burden test." [1] *See Employment Division, Dep't of Human Res. of Or. v. Smith,* 494 U.S. 872, 894, 110 S.Ct. 1595, 1608, 108 L.Ed.2d 876, 896

---

1. The phrase "substantial burden" never appears expressly in the *Sherbert* opinion. *Sherbert,* rather, speaks of a "substantial infringement" of a First Amendment right. *See Sherbert v. Verner,* 374 U.S. 398, 406, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965, 972 (1963).

(1990) (O'Connor, J., concurring) ("[W]e have respected both the First Amendment's express textual mandate and the governmental interest in regulation of conduct by requiring the government to justify any *substantial burden* on religiously motivated conduct by a compelling state interest . . . .") (emphasis added). That is, under *Sherbert*—to the extent it survives *Smith's* analysis, discussed *infra*—strict scrutiny is not the pertinent standard of review unless the governmental action in question imposes a "substantial burden" on the challenger's Free Exercise rights.

As stated in *Trinity Assembly of God of Baltimore City v. People's Counsel for Baltimore County*, 407 Md. 53, 87, 962 A.2d 404, 424 (2008), "[t]he substantial burden test (the *Sherbert* test) remained the law of the land governing claims under the Free Exercise Clause until 1990," when the Supreme Court decided *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. at 872, 110 S.Ct. at 1608, 108 L.Ed.2d at 896. In *Smith*, two individuals were fired from their jobs because they used peyote—in violation of Oregon penal statutes—at a ceremony in the Native American Church, of which they were members. *Smith*, 494 U.S. at 874, 110 S.Ct. at 1597, 108 L.Ed.2d at 883. Upon termination, the individuals applied for unemployment benefits, which were denied ultimately by the Oregon Employment Division because the claimants were ineligible, having been terminated for work-related "misconduct." *Smith*, 494 U.S. at 874, 110 S.Ct. at 1598, 108 L.Ed.2d at 883.

The question before the Supreme Court was

whether the Free Exercise Clause of the First Amendment permits the State of Oregon to include religiously inspired peyote use within the reach of its general criminal prohibition on use of that drug, and thus permits the State to deny unemployment benefits to persons dismissed from their jobs because of such religiously inspired use.

*Smith*, 494 U.S. at 874, 110 S.Ct. at 1597, 108 L.Ed.2d at 882. Rejecting the claimants' argument that "their religious motivation for using peyote places them beyond the reach of a

criminal law that is not specifically directed at their religious practice," the Supreme Court, speaking through Justice Scalia, held that "if prohibiting the exercise of religion ... is not the object of the [governmental action] but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended." *Smith*, 494 U.S. at 878, 110 S.Ct. at 1600, 108 L.Ed.2d at 878. Further, in holding that *Sherbert's* "substantial burden test" need not be applied, the Court distinguished *Sherbert*, stating that *Sherbert* dealt with unemployment compensation cases, which, with their accompanying eligibility criteria and "good cause" exception, "create[ ] a mechanism for individualized exemptions" that "invite consideration of the particular circumstances behind an applicant's unemployment...." *Smith*, 494 U.S. at 884, 110 S.Ct. at 1603, 108 L.Ed.2d at 884. Thus, *Smith* stands for the proposition that "generally applicable, religion-neutral laws that have the effect of burdening a particular religious practice need not be justified by a compelling governmental interest," *Smith*, 494 U.S. at 886 n. 3, 110 S.Ct. at 1604 n. 3, 108 L.Ed.2d at 890 n. 3, even if the effect of the governmental action is to substantially burden the challenger's religious practice. *See Neutral Rules of General Applicability: Incidental Burdens on Religion, Speech, and Property*, 115 HARV. L.REV. 1713, 1721 (2001) ("*Smith* ... held that the state has no duty to exempt people whose religions are substantially burdened as a result of a neutral and generally applicable law.").

Because *Smith* held *Sherbert's* "substantial burden" test inapplicable to cases involving neutral laws of general applicability, our first task in the present case unquestionably is to determine whether the trial court's decision to deny Petitioner's requests for a postponement due to a religious conflict results from application of a neutral law of general applicability, or an analog thereto—a task that I undertake *infra*. Assuming *arguendo* (for a moment) that the trial court's decision does not fit there, the next inquiry is whether application of *Sherbert's* "substantial burden" test is appropriate, and if so, whether the test necessitates the standard of review in

the present case to be strict scrutiny.[2] Answering this second group of questions requires a closer examination of the effect of *Smith* on *Sherbert*, an analysis over which much ink has been spilled already.

One school of thought holds that *Smith* limited *Sherbert* only to those cases involving individualized exemptions vis á vis a system of unemployment benefits. Language from *Smith* supports arguably this narrow reading, *see Smith*, 494 U.S. at 883, 110 S.Ct. at 1602, 108 L.Ed.2d at 888 ("We have never invalidated any governmental action on the basis of the *Sherbert* test except the denial of unemployment compensation. Although we have sometimes purported to apply the *Sherbert* test in contexts other than that, we have always found the test satisfied. In recent years we have abstained from applying the *Sherbert* test (outside the unemployment compensation field) at all.") (internal citations omitted). *See also Gary S. v. Manchester Sch. Dist.*, 374 F.3d 15, 18 (1st Cir.2004) ("The *Smith* majority expressly limited ... *Sherbert*

---

**2.** While the Supreme Court in *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531–32, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472, 489 (1993), stated that "[a] law failing to satisfy [*Smith's* neutrality and general-applicability] requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest"—without mention of a finding of "substantial burden"—elsewhere in the opinion the Court noted that "a law *burdening* religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny," and that "a law *restrictive of religious practice* must advance 'interests of the highest order.'" *Hialeah*, 508 U.S. at 546, 113 S.Ct. at 2233, 124 L.Ed.2d at 498 (emphasis added). I, therefore, do not read *Smith* or *Hialeah* as doing away with the first *Sherbert* prong in cases where *Smith's* neutrality and general-applicability guideposts are not met., *See* Kenneth A. Klukowski, *In Whose Name We Pray: Fixing the Establishment Clause Train Wreck Involving Legislative Prayer*, 6 GEO. J.L. & PUB. POL'Y 219, 277 n. 418 (2008) ("*Sherbert* applies to laws targeting religious practice, while *Smith* applies to generally-applicable laws. They address different types of state action, and need not contradict each other. The legal fact that *Smith* does not overrule *Sherbert* can be understood both by the fact that *Sherbert* is still referenced as authoritative in recent Supreme Court cases, and because *Smith* never says it overrules *Sherbert*. To the contrary, *Smith* simply holds that *Sherbert* does not apply to religion-neutral laws.... The Supreme Court has clearly stated as much, [citing *Hialeah* ]....").

to the unemployment compensation field."); *Miller v. Drennon*, 1991 WL 325291, at *9, 1991 U.S. Dist. LEXIS 20382, at *23 (D.S.C. 20 June 1991) ("According to *Smith, Sherbert* and its progeny are limited to the denial of unemployment benefits...."); *S. Ridge Baptist Church v. Indus. Comm'n of Oh.*, 911 F.2d 1203, 1213 (1990) (Boggs, J., concurring) ("[T]he Supreme Court now appears to have confined the applicability of those words to the rather limited field of unemployment compensation ...."); *see also* Sara Witt, *Modifying the Religious Land Use and Institutionalized Persons Act to Create a Constitutional Statutory Protection for Religious Landowners*, 59 CASE. W. RES. L.REV. 767, 771 (2009) ("Some suggest that the *Sherbert* exception is further limited to unemployment compensation cases alone.").

The other main school of thought—and the one that has garnered the most support—is that *Smith* limited application of *Sherbert's* "substantial burden" test to all individualized exemptions, and not only to those involving unemployment benefits. Language in *Smith* hints at this conclusion, *see Smith*, 494 U.S. at 884, 110 S.Ct. at 1603, 108 L.Ed.2d at 889 ("Even if we were inclined to breathe into *Sherbert* some life beyond the unemployment compensation field ...."), and language from published opinions embraces this view. *See, e.g., In re Hofer*, 329 Mont. 368, 124 P.3d 1098, 1110 n. 2 (2005) ("Despite its expressed reluctance, the Supreme Court in fact has applied the *Sherbert* test outside the unemployment benefits context."). This view is best exemplified, perhaps, by the Supreme Court's decision in *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), in which the Court applied strict scrutiny to certain municipal ordinances it held to be non-neutral and not generally applicable, but did not involve unemployment benefits. Specifically, *Hialeah* dealt with the Santerian religion, which practices animal sacrifice as a principle form of devotion, a branch church of which leased land in the city of Hialeah to establish itself there. *Hialeah*, 508 U.S. at 524–26, 113 S.Ct. at 2222–23, 124 L.Ed.2d at 484–86. Expressing concern over the religious practices' effect on public morals and safety, the

City passed various enactments which declared the City's commitment to proscribing animal sacrifices. *Hialeah,* 508 U.S. at 526, 113 S.Ct. at 2223, 124 L.Ed.2d at 486. After holding the ordinances to be neither neutral nor generally-applicable, the Supreme Court applied strict scrutiny (á la *Sherbert*) to strike down the ordinances.[3] *Hialeah,* 508 U.S. at 546, 113 S.Ct. at 2233, 124 L.Ed.2d at 498–98. Thus, the Supreme Court has applied *Sherbert* to scenarios other than those involving unemployment benefits.

In subscribing to the latter understanding of *Smith's* effect on *Sherbert,* I do not write on a clean slate. In *Trinity Assembly of God of Baltimore City, Inc. v. People's Counsel for Baltimore County,* 407 Md. 53, 87 n. 13, 962 A.2d 404, 424 n. 13 (2008), discussed more fully *infra,* I wrote for a unanimous Court (albeit as dicta) that *"Smith* left open the possibility that the substantial burden test still applies to Free Exercise Clause challenges where the government made an individualized assessment." We did not see *Sherbert* in *Trinity* as limited merely to unemployment compensation scenarios, but rather, to all individualized assessment situations. Therefore, assuming, *arguendo,* that the trial court's denial in the present case of Petitioner's motion to postpone the trial for the two-days of Shavuot was not the result of a neutral and generally-applicable government action, my reading of *Smith* and its progeny requires a *Sherbert*-type, "substantial burden," analysis. If I determine that a substantial burden analysis is required, this Court's opinion in *Trinity, supra,* becomes relevant more so.

To summarize the road map I believe should be followed in determining the appropriate standard of review to be applied

---

**3.** *See* Catherine Maxson, *"Their Preservation is Our Sacred Trust"— Judicially Mandated Free Exercise Exemptions to Historic Preservation Ordinances under Employment Division v. Smith,* 45 B.C. L.Rev. 205, 225 (2003) ("Because the ordinances [in *Hialeah* ] were neither neutral nor generally applicable under *Smith,* the Court subjected Hialeah's laws to *Sherbert's* ... analysis."). The Court did not undertake explicitly an analysis of the first, "substantial burden," prong of *Sherbert,* finding that point likely indisputable.

in the present case: (1) determine whether the trial court's denial of Petitioner's motions to postpone the trial for the Shavuot holiday was the result of a "neutral, generally applicable" governmental action such that application of *Sherbert* is inapposite (stated differently), determine whether the trial court's denial of the motions was an "individualized assessment" which necessitates application of *Sherbert's* substantial burden test; (2) assuming the denial is not a neutral and generally applicable governmental action, apply *Sherbert's* substantial burden test—with *Trinity's* gloss—to determine whether strict scrutiny or abuse of discretion is the pertinent standard of review; and (3) assuming abuse of discretion is the appropriate standard of review, decide whether the trial court abused its discretion in denying Petitioner's motions to postpone the trial for the Shavuot holiday. As will be explained more fully *infra,* one of the outcomes, I believe, is that application of strict scrutiny is inapposite to the present case.

## II. Neutral and Generally–Applicable Governmental Conduct, or Individualized Assessment?

As noted *supra,* "generally applicable, religion-neutral laws that have the effect of burdening a particular religious practice need not be justified by a compelling governmental interest." *Smith,* 494 U.S. at 886 n. 3, 110 S.Ct. at 1604 n. 3, 108 L.Ed.2d at 890 n. 3. While neutrality and general-applicability "are interrelated, and ... failure to satisfy one requirement is a likely indication that the other has not been satisfied," *Hialeah,* 508 U.S. at 531, 113 S.Ct. at 2226, 124 L.Ed.2d at 489, each requires its own analysis ultimately. In this regard, *Hialeah* is instructive. *See Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214, 1232 (11th Cir.2004) (*"Hialeah* presented an opportunity for the Supreme Court to elaborate upon what was meant by neutrality and general applicability."). Briefly,

[i]n *Hialeah,* the Court reviewed various ordinances of the City of Hialeah that effectively prohibited members of the Santeria religion from sacrificing animals, a traditional practice of Santeria Worship.... The Court ... examined the

Hialeah City ordinances and found that they were neither neutral nor of general applicability. Instead, the ordinances were written in such a way as to target only those animal killings that occurred attendant to Santeria religious worship. The Court found additionally that the city had no compelling governmental interest to support the ordinances.

*State v. Green,* 99 P.3d 820, 826 (Utah 2004) (internal citations omitted).

## A. Neutrality

Under *Hialeah,* a law (or rule) is, by definition, not neutral "if the object of the law [or rule] is to infringe upon or restrict practices because of their religious motivation...." *Hialeah,* 508 U.S. at 533, 113 S.Ct. at 2227, 124 L.Ed.2d at 490. The starting point in determining whether the object or purpose of the government action is to suppress religious conduct "must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face. A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language or context." *Id.*

In the present case, the trial court's explanation of the denial of Petitioner's motions to postpone is devoid of any language that could be construed as having a purpose or object of denying the motions because of Petitioner's religious convictions. As the trial court stated:

[T]he administrative judge will not let me, hold up jurors for an extra two days because of something that was not brought to our attention. And the case has already been rescheduled once, and I simply cannot suspend the trial for those two days.... And, you know, our trial calendar is extremely heavy right now. I'm down two judges, and I'm simply not authorized to suspend the trial for two days.

The record, therefore, reveals that the denial stemmed (at least in part), not from any religious animus, but rather from the lack of authorization from the administrative judge, apparently because Petitioner was raising an issue that, theretofore, was not brought to the attention of the trial court.

Although the trial court's decision was neutral facially, "[f]acial neutrality is not determinative," as the "Free Exercise Clause protects against governmental hostility which is masked as well as overt." *Hialeah*, 508 U.S. at 534, 113 S.Ct. at 2227, 124 L.Ed.2d at 491. In *Hialeah*, the Supreme Court scrutinized the record for evidence of covert discrimination, concluding ultimately the object of the City of Hialeah's ordinances was to infringe upon the Church member's Free Exercise rights, considering that the only conduct subject to the ordinances was the expression of the religious exercise (animal sacrifice) of the Church members. *See Hialeah*, 508 U.S. at 535, 113 S.Ct. at 2228, 124 L.Ed.2d at 492. The record in the present case is devoid of any evidence from which one could infer reasonably that the trial court was acting in a manner other than a neutral arbiter. The trial court articulated the following reasons for denying the motion to postpone the trial, none of which suggest that the judge's decision would have been any different had Petitioner been Christian, Muslim, or a member of any other religious faith (or an agnostic or atheist): lack of authorization from the administrative judge; busy trial calendar; lack of judges; effect on witnesses, jurors and members of the community; and Petitioner's delay in bringing the problem to the court's attention. Unlike *Hialeah*, in which the legislative history of the City's ordinances revealed concern "that certain religions may propose to engage in [religious] practices which are inconsistent with public morals, peace or safety," *Hialeah*, 508 U.S. at 526, 113 S.Ct. at 2223, 124 L.Ed.2d at 486, the record here is devoid of even a hint of religious animus.

Finally, the Court in *Hialeah* stated that "[i]n determining if the object of a law is a neutral one ..., we can also find guidance in our equal protection cases." *Hialeah*, 508 U.S. at 540, 113 S.Ct. at 2230, 124 L.Ed.2d at 495. In undertaking this mode of analysis, the Court noted that "[r]elevant evidence includes ... the historical background of the decision under challenge, the specific series of events leading to the ... official policy in question, and the legislative or administrative history, including contemporaneous statements made

by members of the decisionmaking body." *Id.* A judicial determination to deny a continuance or a postponement (as opposed to a legislative act), has no legislative history, but the "specific series of events leading to" the judge's ruling in this case is telling. The relevant facts of the present case are that the parties became aware of the 3 June 2008 trial date on 24 January 2008, yet Petitioner waited until 6 May 2008—less than a month prior to the commencement of trial—to inform the trial court that neither Petitioner nor his counsel would be present on the two days of trial that fell out on the Shavuot holiday. *See* PIRKEI AVOT—ETHICS OF OUR FATHERS § 1:14 ("If not now, when?"). The trial judge mentioned at the 14 and 22 May 2008 hearings on the matter Petitioner's tardiness. Whether the trial court abused its discretion to rely on this delay is discussed *infra;* however, it appears clear to me that this justification, alone or in conjunction with the balance of the record, in no way evinces an "object" on the part of the trial court to infringe upon Petitioner's Free Exercise rights. According to Judge Sykes of the federal Court of Appeals for the Seventh Circuit, "the point of [*Hialeah* ]" was that "even a facially neutral law of general applicability might be discriminatory in violation of the Free Exercise Clause because of its design, operation . . . or in the manner in which it is enforced." *River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.,* 611 F.3d 367, 387 (7th Cir.2010) (Sykes, J., dissenting). Concluding that the record is devoid of any evidence from which one could conclude that the trial court's denial of Petitioner's motions to postpone the trial was either designed to, or operated to, infringe upon Petitioner's Free Exercise rights, I would hold that the judicial determination in the present case was "neutral."

## B. General Applicability

One federal district court detailed *Hialeah's* analysis of the "general-applicability" prong:

Discussing the requirement of general applicability, the *Lukumi* [C]ourt observed that "all laws are selective to some extent, but categories of selection are of paramount

concern when a law has the incidental effect of burdening religious practice." The "government . . . cannot in a selective manner impose burdens only on conduct motivated by religious belief." The ordinances at issue in *Lukumi* were so deficient that the court declined to "define with precision the standard used to evaluate whether a prohibition is of general application." However, the *Lukumi* [C]ourt made clear that a law is not generally applicable if it was purportedly adopted to protect certain interests, yet "fails to prohibit nonreligious conduct that endangers these interests in a similar or greater degree than [the banned religious conduct] does."

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 282 F.Supp.2d 1236, 1244–45 (D.N.M.2002) (internal citations omitted); *see Green*, 99 P.3d at 828 (employing a similar analysis).

The governmental action at issue here—the denial of Petitioner's motions to postpone the trial for the Shavuot holiday—has no "categories of selection." Being a judicial determination, the trial court's ruling is made on particular motions, and facts, applicable to two unique parties,; but, there is nothing in any of the judge's rulings that suggests that she "selected" Petitioner's motions for denial on the grounds that they were based on Petitioner's intent to observe a religious holiday. Further, the judge's rulings do not "fail to prohibit nonreligious conduct that endangers the[ ] interests" sought to be protected by the ruling. That is, as mentioned *infra*, the trial court denied the motions, citing interests of docket efficiency and the effect a delay would have on jurors and witnesses; nowhere in the rulings, however, did the judge suggest that she would have granted the motions to postpone if they were based on nonreligious reasons (*e.g.*, the Bowl Championship Series title game,[4] the World Series,[5] etc.).

---

4. *See* Federal Trial Continued for BCS National Championship Game, http://law.about.com/b/2010/12/10/federal-trial-continued-for-bcs-national-championship-game-auburn-vs-oregon.htm (last visited 21 December 2010) ("This past week the BCS National Championship game

To be sure, judges and courts decide cases and controversies. *See Thom v. Cook*, 113 Md. 85, 88, 77 A. 120, 120 (1910) (quoting *Mills v. Green*, 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293, 293 (1895)) ("The duty of this [C]ourt, as of every other judicial tribunal, is to decide actual controversies...."). Accordingly, the judge's ruling on a motion affects generally only the litigants to the particular case. Thus, a judicial ruling does not have the same generally-applicable effect as a legislative act. That said, I believe the judge's denial of Petitioner's motions to postpone the trial was the judicial analog to a generally-applicable legislative act, in that there is no evidence in the record from which one could conclude that the judge's ruling would have been any different if faced with nonreligious justifications for the requested postponement. *See State v. Blackmon*, 130 Ohio App.3d 142, 719 N.E.2d 970, 975 (1998) (holding that appellant's Free Exercise rights were not violated where there was no evidence that the trial court considered anything other than "generally applicable factors" in considering a motion for a continuance, including: length of delay requested, inconvenience to litigants and witnesses, whether the moving party contributed to the circumstances for which the request was made, etc.).

## C. Individualized Assessment

Notwithstanding my view that the judge's rulings on Petitioner's motions to postpone the trial constitute a judicial analog to a neutral and generally-applicable legislative act, I must undertake another inquiry, namely, whether the judge's determination constitutes an "individualized assessment," sufficient to trigger a *Sherbert* analysis. *See Kissinger v. Bd. of Trustees of Ohio State Univ.*, 5 F.3d 177, 179 (6th Cir.1993)

---

pitting Auburn against Oregon was cited as the grounds for continuing a federal trial in the U.S. District Court for the Southern District of Alabama-and the motion was granted.").

5.  *See* Lawyers Who Follow the Texas Rangers Are Crazy, http://www.abovethelaw.com/2010/10/lawyers-who-follow-the-texas-rangers-are-crazy/ (last visited 21 December 2010) (detailing the story of a Texas attorney who requested a continuance to attend the World Series).

(employing a "three-part analysis": whether the governmental action "was generally applicable, was not aimed at particular religious practices, and did not contain a system of particularized exemptions"). *But see First Covenant Church v. City of Seattle,* 120 Wash.2d 203, 840 P.2d 174, 181 (1992) (appearing to conflate the "individual assessment" analysis with the "neutral/generally-applicable" analysis).

*Smith* said, vis-á-vis individualized exemptions/assessments, that:

> The *Sherbert* test, it must be recalled, was developed in a context that lent itself to individualized governmental assessment of the reasons for the relevant conduct. As a plurality of the Court noted in [*Bowen v.*] *Roy* [476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986) ], a distinctive feature of the unemployment compensation programs is that their eligibility criteria invite consideration of the particular circumstances behind an applicant's unemployment: The statutory conditions ... provided that a person was not eligible for unemployment compensation benefits if, without good cause, he had quit work or refused available work. The "good cause" standard created a mechanism for individualized exemptions. As the plurality pointed out in *Roy,* our decisions in the unemployment cases stand for the proposition that where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of "religious hardship" without compelling reason.

*Smith,* 494 U.S. at 884, 110 S.Ct. at 1603, 108 L.Ed.2d at 884 (internal citations and quotation marks omitted).

To be sure, and as mentioned *supra,* because trial courts deal with discrete controversies between the parties before them, each ruling or determination in the case is somewhat "individualized." The rub, though, is whether a judicial ruling is cut from the same cloth as the individualized exemptions with which the Supreme Court in *Sherbert* and its progeny dealt. In formulating an answer to this question, I proceed along the following path:

The determination of whether the *Sherbert* exception [*i.e.* application of *Sherbert*] is triggered proceeds in two steps. The first focuses on whether a law contains a mechanism similar to the "good cause" criterion that is open to unfettered discretionary interpretation. If such a mechanism exists, the second step requires courts to determine whether it is enforced in a discriminatory manner. Absent evidence of discrimination in the actual enforcement of the [governmental action], . . . *Sherbert* . . . is not triggered, and there is no need to apply the compelling state interest test. Carol M. Kaplan, *The Devil Is in the Details: Neutral, Generally Applicable Laws and Exceptions from* Smith, 75 N.Y.U. L.Rev. 1045, 1081 (2000).

First, although there is no requirement in civil cases in the posture of the present case that a judge find expressly "good cause" before granting a motion to postpone a trial,[6] a trial court's decision to grant or deny a motion to postpone or continue a trial is within the sound discretion of the trial court, and, accordingly, the decision is subject to a great degree of deference on appellate review. *See Schroder v. State,* 206 Md. 261, 265, 111 A.2d 587, 589 (1955) ("It has long been a well settled rule in this State that the granting or refusing of a continuance is within the sound discretion of the trial court and will not be set aside on appeal unless the exercise of that discretion has been arbitrary."). Although the abuse of discretion standard does not leave judges with "unfettered discretionary interpretation," appellate review of this type of judicial determination is highly deferential and gives judges a substantial degree of discretion in granting such motions.

Whether the abuse of discretion standard of review that insulates, to a degree, a trial court's decision to grant or deny a motion to postpone or continue a trial is akin to the "good cause" standard with which *Sherbert* and the other unemployment compensation cases deal, absent from the record here is

---

6. *But see* Md. Rule 2–508(b) ("When an action has been assigned a trial date, the trial shall not be continued on the ground that discovery has not yet been completed, except for good cause shown.").

any evidence that this ruling specifically, rulings from this particular judge, or rulings from this particular court, were in any way discriminatory. Absent such evidence, I conclude *Sherbert* to be inapposite and inapplicable to the present factual situation.[7]

One final observation on this point is in order. I do not believe that the legislative ills that strict scrutiny protects against in the Free Exercise sphere are applicable with equal force to the judicial branch. *See* GORDON S. WOOD, THE CREATION OF THE AMERICAN REPUBLIC, 1776–1787 609 (1969) (concluding that separation of powers was intended to "ensure the protection of individual rights against all governmental encroachments, *particularly by the legislature,* the body which Whigs ha[d] traditionally cherished as the people's exclusive repository of their public liberty") (emphasis added). That is, a concern of any democratic society is that an oppressive or tyrannical electorate will emerge and elect similarly minded legislative representatives, who, in turn, will enact laws that will oppress certain disfavored groups. *See Riley v. St. Luke's Episcopal Hosp.,* 196 F.3d 514 (5th Cir.1999) (Stewart, J., dissenting), *rev'd,* 252 F.3d 749 (5th Cir.2001) ("The branch thought to constitute the greatest danger ... was the legisla-

---

**7.** Instructive on this point is *Rector, Wardens, and Members of the Vestry of St. Bartholomew's Church v. City of New York,* 914 F.2d 348 (2d Cir.1990), in which members of a church alleged violations of their Free Exercise rights when the Landmark Preservation Commission of New York City applied the City's "Landmarks Law"—which protects buildings deemed "landmarks" from being altered or demolished—to prevent them from replacing the church's activities building with an office tower. *See St. Bartholomew,* 914 F.2d at 350–352. *St. Bartholomew* is particularly apt because the plaintiffs did not assert that the law itself infringed upon their Free Exercise rights; rather, they alleged that the decisionmaker's (*i.e.,* the Board's) application of the statute caused the constitutional violation. The church members, in support of their argument that the Commission's application of the Landmarks Law infringed impermissibly on their Free Exercise rights, "cite[d] commentators ... who are highly critical of the Landmarks Law on grounds that it accords great discretion to the Commission...." *St. Bartholomew,* 914 F.2d at 354. In responding to this argument, however, the Second Circuit held that "absent proof of the discriminatory exercise of discretion, there is no constitutional relevance to these observations." *St. Bartholomew,* 914 F.2d at 355.

tive; during the operation of the Articles of Confederation, the legislature, in the view of many of the Framers, intruded impermissibly into the sphere of liberty and private property."). To protect against laws whose object is to restrict religious practice, strict scrutiny in the Free Exercise realm acts as a judicial check against this legislative possibility, placing the burden on the government to prove that the legislative enactment is tailored narrowly to further a compelling governmental interest. If the government fails to shoulder this burden with respect to laws that place a substantial burden on one's Free Exercise rights, it is the courts' duty to invalidate such a law or action.

The judiciary, then, "[i]n our system of checks and balances ... by its very nature, is and is supposed to be the anti-democratic branch." *Porter v. State,* 47 Md.App. 96, 109, 421 A.2d 985, 992 (1980) (Moylan, J., concurring). Or, stated differently, the judiciary was envisioned as the branch of government that would curb a legislature's attempts to oppress the minority (or, in this case, oppress one's religious beliefs and/or practices), and not the branch that, itself, would engage in the oppressing. The possibility of a "tyranny of the majority" in legislative enactments—perhaps best exemplified in *Hialeah*—does not exist to the same degree in isolated judicial rulings or determinations. Of course, it is possible for a judge to decide the outcome of a case or of a motion based on religious animus; strict scrutiny, however, does not apply inevitably to all judicial determinations invoking the word "religion." The abuse of discretion standard provides adequately a proper check against such a possibility.

### III. Substantial, or Mere Incidental, Burden?

If one disagrees with my view that the judge's denial of Petitioner's motions to postpone the trial for Shavuot constitutes a neutral and generally-applicable governmental action, it does not follow necessarily that strict scrutiny is the proper standard of review. As discussed *supra,* to the extent a governmental action is an "individualized assessment" or is not neutral and generally applicable, under *Sherbert,* strict scruti-

ny applies only if the governmental action in question places a "substantial burden" on one's Free Exercise rights.

In this regard, our opinion in *Trinity, supra,* becomes relevant. Accordingly, a brief reiteration of the relationship between *Trinity* and Free Exercise jurisprudence is in order.

In 1993, Congress enacted ... the Religious Freedom Restoration Act (the "RFRA"), in response to what it perceived to be an erosion of religious liberty reflected in Supreme Court jurisprudence interpreting and applying the Free Exercise Clause of the First Amendment. [42 U.S.C.A.] § 2000bb(a). Three decades before Congress enacted the RFRA, the Supreme Court decided *Sherbert v. Verner* .... The substantial burden test (the *Sherbert* test) remained the law of the land governing claims under the Free Exercise Clause until 1990 .... [when it decided] *Employment Div., Dep't of Human Resources of Or. v. Smith* .... The Court [in *Smith*] turned its back on the substantial burden test, noting that it "was developed in a context that lent itself to individualized governmental assessment of the reasons for the relevant conduct," namely unemployment compensation. Congress enacted the RFRA to respond to *Smith.* See City *of Boerne v. Flores,* 521 U.S. 507, 513 [117 S.Ct. 2157, 138 L.Ed.2d 624] (1997) (noting that "Congress enacted RFRA in direct response to ... *Smith* ").... Congress disagreed that application of the substantial burden test would invite anarchy, finding instead that it "is a workable test for striking sensible balances between religious liberty and competing prior government interests." 42 U.S.C.A. § 2000bb(a)(5). Congress found further that neutral, generally applicable laws nonetheless may have the effect of burdening religious exercise to the same degree as laws intended to stifle such exercise. Accordingly, the RFRA announced that "[g]overnment shall not substantially burden a person's exercise of religion[,] even if the burden results from a rule of general applicability ... [unless] it demonstrates that application of the burden ... is in furtherance of a compelling governmental interest[ ] and is the least restrictive means of furthering that ... interest." *Id.*

§ 2000bb–1 (a) & (b). An attack on the RFRA, however, was quick and decisive. In *City of Boerne v. Flores*, the Supreme Court partially invalidated the RFRA, holding that the enforcement power granted to Congress by the Fourteenth Amendment did not empower Congress to impose universally the substantial burden test on state and local governments.... After three years of hearings, Congress found that actions by state and local governments, in these two areas [land use and institutionalized persons] particularly, threaten religious exercise. To ensure that the RLUIPA did not suffer the same fate as the RFRA, Congress circumscribed the reach of the substantial burden test.

*Trinity*, 407 Md. at 86–89, 962 A.2d at 423–425. Because courts "have defined RLUIPA's substantial burden provision by reference to the Supreme Court's free exercise jurisprudence," *Vision Church, United Methodist v. Vill. of Long Grove*, 468 F.3d 975, 996 (7th Cir.2006), and because it is my view that the substantial burden test is relevant to the present case, I turn for guidance to *Trinity*—a Maryland RLUIPA case—to "gauge the reach of 'substantial burden.'" *Trinity*, 407 Md. at 93, 962 A.2d at 427; *see Rouse v. Caruso*, 2007 WL 209922, at *6, 2007 U.S. Dist. LEXIS 4941, at *18 (E.D.Mich. 24 January 2007) ("The RLUIPA does not define 'substantial burden,' but the courts that have considered the Act have defined the term by reference to the Supreme Court's First Amendment case law.").

In *Trinity*, this Court cited, with approval, the following elucidation of other courts regarding "substantial burden":

● Government action "which may make it more difficult to practice certain religions but which ha[s] no tendency to coerce individuals into acting contrary to their religious beliefs" does not qualify as a substantial burden—*Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450, 108 S.Ct. 1319, 1326 [99 L.Ed.2d 534] (1988).

● "[A] substantial burden on religious exercise occurs when a ... government, through act or omission, 'put[s] substantial pressure on an adherent to modify his behavior and to

violate his beliefs.' "—*Lovelace v. Lee,* 472 F.3d 174, 187 (4th Cir.2006).

- "A 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise."— *Guru Nanak Soc'y of Yuba City v. County of Sutter; Casey Kroon; Dennis Nelson; Larry Munger; Dan Silva,* 456 F.3d 978, 988 (9th Cir.2006).

- "A 'substantial burden' must place more than an inconvenience on religious exercise; a 'substantial burden' is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly."— *Midrash Sephardi,* 366 F.3d at 1227.

- A substantial burden on religion is a restriction that "prevents adherents from conducting or expressing their religious beliefs or causes them to forgo religious precepts."— *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch,* 406 F.Supp.2d 507, 515 (D.N.J.2005)

*Trinity,* 407 Md. at 93–94, 962 A.2d at 428–29. I think that the judge's denial of Petitioner's motion to postpone the trial for Shavuot did not "coerce," "put substantial pressure on," or "impose a significantly great restriction or onus upon" Petitioner to violate his religious precepts. Had the judge's denial of his motion to postpone placed such a burden on Petitioner's Free Exercise rights (or Petitioner perceived truly such a burden), Petitioner, I suspect, would have informed the trial court at some point during the period between 24 January 2008—when the final trial dates were scheduled—and 6 May 2008—the date on which Petitioner first and ultimately informed the trial court of the Shavuot conflict, less than a month before commencement of trial. *See United States v. Baldwin,* 770 F.2d 1550, 1557 (11th Cir.1985) ("Appellant had a duty to inform the court [about a religious holiday] sufficiently before the trial in order to assert his [F]irst [A]mendment rights.") (emphasis omitted). That is not to say that the exercise of Petitioner's religion was not affected in any way by the trial court's denial of his motion; of course, neither he nor his counsel was able to attend trial on either day of Shavuot.

Yet, governmental action "that merely inconvenience[s] the exercise of religion do[es] not create a substantial burden." *First Vagabonds Church of God v. City of Orlando*, 610 F.3d 1274, 1290 (11th Cir.2010), *vacated by*, 616 F.3d 1229 (11th Cir.2010).

In distilling the authorities in *Trinity*, we stated that a substantial burden on religious exercise exists—albeit in the RLUIPA context—"only if it leaves the aggrieved religious institution without a reasonable means to observe a particular religious precept." *Trinity*, 407 Md. at 96, 962 A.2d at 429. An amicus here asks rhetorically: "If Jews could not hold public office in Maryland until 1825, is it an unfair stretch—or an unconscionable reality—to suggest that they cannot freely observe their holidays in 2010?" Brief for Interested Professors of Law as Amici Curiae Supporting Petitioner, at 31. Simply put, Petitioner *was* free to celebrate Shavuot as he deemed fit; the trial court did not compel his presence in court in violation of the Jewish faith. Accordingly, because Petitioner was with "reasonable means" to observe the holiday of Shavuot, I do not think a "substantial burden" was placed upon his Free Exercise rights. *See State v. Pride*, 1 S.W.3d 494, 507 (Mo.Ct.App.1999) (applying the abuse of discretion standard to a denial of a motion to continue a trial); *Gordon v. Gordon*, 739 S.W.2d 728, 731 (Mo.Ct.App.1987) (same).

## IV. Applying the Abuse of Discretion Standard of Review to the Present Case

According to the Majority opinion, the trial court abused its discretion in denying Petitioner's motions to postpone the trial "because the articulated rationales ... failed to reasonably accommodate Petitioner's right to engage in religious conduct and to meaningfully participate in his trial." 418 Md. 231, 244, 13 A.3d 1227, 1235 (2011). That is not the abuse of discretion that I would find. Rather, I believe the trial court abused its discretion because the facts in evidence, according to the record extract, do not support the proffered rationales for denying Petitioner's motions to postpone the trial.

Pursuant to Maryland Rule 2–508, "[o]n a motion of any party ... the court *may* continue a trial or other proceeding as justice may require." (Emphasis added.) Because the Rule invokes the precatory word "may," we have held that "the decision to grant a continuance [or postponement] lies within the sound discretion of the trial judge" and that "[a]bsent an abuse of that discretion we historically have not disturbed the decision to deny a motion for a continuance [or postponement]." *Touzeau v. Deffinbaugh,* 394 Md. 654, 669, 907 A.2d 807, 816 (2006).

In *Gray v. State,* we explained the abuse of discretion standard as follows:

Abuse of discretion is one of those very general, amorphous terms that appellate courts use and apply with great frequency but which they have defined in many different ways.... [A] ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling. The decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable. That kind of distance can arise in a number of ways, among which are that the ruling either does not logically follow from the findings upon which it supposedly rests or has no reasonable relationship to its announced objective. That, we think, is included within the notion of "untenable grounds," "violative of fact and logic," and "against the logic and effect of facts and inferences before the court."

*Gray v. State,* 388 Md. 366, 383–84, 879 A.2d 1064, 1073–74 (2005) (quoting *Dehn v. Edgecombe,* 384 Md. at 628, 865 A.2d at 616 (quoting *North v. North,* 102 Md.App. 1, 13–14, 648 A.2d 1025, 1031–1032 (1994))). Although we are reticent (because of the highly deferential nature of the standard) to find an abuse of discretion in a trial court's denial for a request for a postponement or continuance, I would hold here that a trial court is required to make an on-the-record explanation of the reasons supporting a decision to deny. *See Baumann v. Wyse,* 2010 WL 114422, at *2, 2010 N.J.Super.

Unpub. LEXIS 78, at *4 (N.J.Super.Ct.App.Div.2010) (finding an abuse of discretion where the trial court gave no explanation in denying a party's motion). While the trial court, in this case, did make an on-the-record findings, I would hold that her denial is "well removed from any center mark imagined" by this Court and that she abused her discretion in denying the motion, not because her ruling does not flow logically from the findings upon which it rests, but rather because the record extract *does not support* the articulated findings upon which it rests. *See Grant v. State*, 414 Md. 483, 995 A.2d 975 (2010) (holding that it is an abuse of discretion for a court to "exercise that discretion without preserving the evidentiary basis for its decision" and finding that "[t]he fact that the trial court's bases for its decision ... are beyond our reach makes it untenable to sustain the trial court's ruling as a permissible exercise of its discretion").

As mentioned *supra,* the trial court offered the following reasons for delaying Petitioner's motion to postpone the trial: lack of authorization from the administrative judge; busy trial calendar; lack of judges; effect on witnesses, jurors and members of the community; and delay in bringing the issue to the court's attention. At bottom, however, the judge, at various points throughout the relevant motions hearings, stated that she was willing to work around the two-day Shavuot holiday if defense counsel was able to reschedule the expert witnesses scheduled originally for those two days. For example, during the 22 May 2008 hearing on Petitioner's motion to postpone the trial, the following colloquy ensued:

[JUDGE] I would ask [defense] counsel if you can contact your witnesses to see if any of them are available to reschedule.

[COUNSEL] I will do that, Your Honor.

[JUDGE] *If enough witnesses were rescheduled so that we didn't need to sit either Monday or Tuesday I would not sit.*

> [COUNSEL] I will certainly do that. I will contact all four of the experts. I will make my best efforts to explain the holiday situation and see what we can do.
>
> [JUDGE] [T]he Court's calendar is ... double booked the second week of this [trial]. I at one point had five trials that Monday, we're now down to only two, this, and another malpractice trial which they are bringing in another judge to cover. But that's how, I mean, we're just double and tripled booked every week. So it is important that this trial end that second week. *But if defense counsel can reschedule any of their experts, I am asking them to attempt to do that.*

(Emphasis added.) Similarly, Respondent, in its brief, argues: "By that time [May 5—when Petitioner first sought redress from the Circuit Court] counsel for both of the Defendants had already begun scheduling their expert and fact witnesses to testify at trial. Incidentally, as with most medical malpractice cases, the expert witnesses were physicians or other health care providers. In order to secure these witnesses live at trial, several months notice is often required to ensure their availability. Furthermore, once confirmed, schedules are extremely difficult to adjust within a month's timeframe."

In support of these contentions, Respondent cites to the record extract and the appendix in support of the above assertions. The record extract at the cited-to page, however, merely quotes Respondent's counsel as saying that "I am trying to get my experts and witnesses set in for trial." Furthermore, the cited-to pages in the appendix merely show that Respondent's counsel informed the experts of the June 3 commencement of trial—not that they were either (a) officially scheduled to testify on June 9 or 10 of the trial scheduled to run through June 13; or (b) asked about their availability to testify at another time during that period. Further, while Respondent argues on appeal that "[o]nly one of Respondent's experts (Dr. Geckler) could accommodate moving his trial appearance" and "Respondent's experts were unable to change their trial appearances," Respondent offers no citation to the

record extract to support these statements. My review of the record extract proved fruitless in finding support for Respondent's appellate advocacy.

While the abuse of discretion standard appreciates that "[q]uestions within the discretion of the trial court are much better decided by trial courts than by appellate courts," *In re Yve S.,* 373 Md. 551, 586, 819 A.2d 1030, 1051 (2003), the phrase "standard of review" suggests that appellate courts nevertheless have some duty to review. Where, like here, the reasons upon which a trial court bases his or her denial of a motion to postpone a trial—especially where the tendered and undisputed reasons for a brief postponement is the practice of genuinely held religious beliefs—are not supported by an adequate evidentiary predicate in the record extract, it is my view that the judge abused his or her discretion. *See United States v. Doe,* 356 Fed.Appx. 488, 489 (2d Cir.2009) ("Where First Amendment rights are implicated, our abuse-of-discretion review ... is more rigorous than usual.") (internal quotation marks omitted). Agreeing with the Majority opinion that Petitioner's absence from the trial was presumptively prejudicial, I concur in the judgment.

Judge MURPHY authorizes me to state that he joins the views expressed in this concurring opinion.

ADKINS, J., concurring.

Although the majority is correct that we should avoid addressing constitutional issues when unnecessary, I write separately because I think we should reach the constitutional issue presented here.

The doctrine under which we avoid unnecessary Constitutional issues is most applicable when the constitutional issue is moot, or when there are two independent grounds on which we can resolve the case, one of which does not require constitutional analysis. This is illustrated by the cases cited by the majority. *See* Maj. Op. at 240 n. 7, 13 A.3d at 1232-33 n.7 (*citing In re Julianna B.,* 407 Md. 657, 667, 967 A.2d 776 (2009) (constitutional issue was moot)); *Montrose Christian*

*Sch. Corp. v. Walsh,* 363 Md. 565, 578, 770 A.2d 111, 119 (2001) (analyzing court's order to seal courtroom under common law principle of openness); *Baltimore Sun v. Baltimore,* 359 Md. 653, 659, 755 A.2d 1130, 1133–1134 (2000) (case determined on issues of conflict of laws and on "charitable immunity"). Unlike those cases, this appeal raises the *threshold question* of which of the levels of scrutiny is required for this claimed violation of the Free Exercise Clause of the First Amendment.

The level of scrutiny demanded by the Constitution depends upon whether the action at issue was an individualized government action, or a neutral action of general applicability, as explained in *Employment Division, Dep't of Human Res. of Or. v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). This is not a separate issue which may be avoided, but a threshold question. *See Littlefield v. Forney Indep. Sch. Dist.,* 268 F.3d 275, 292 (5th Cir.2001) ("the opt-out policy enacted by Forney is neutral and of general application[, thus] [a]s a threshold matter ... the [policy] survives constitutional scrutiny under *Smith.*"); *First Assembly of God v. Collier County,* 20 F.3d 419, 423 (11th Cir.1994) ("the threshold questions in analyzing a law challenged under the Free Exercise Clause are (1) is the law neutral, and (2) is the law of general applicability?"); *Hyman v. City of Louisville,* 132 F.Supp.2d 528, 537 (W.D.Ky.2001) (*Smith* requires a court to determine as a threshold matter whether the challenged regulation is "a 'valid and neutral law of general applicability[.]' ") *vacated on other grounds by Hyman v. City of Louisville,* 53 Fed.Appx. 740 (6th Cir.2002). The majority's conclusion that the refusal to postpone the trial was an abuse of discretion does not relieve of us of our obligation to identify which is the appropriate constitutional standard. *Cf. Romer v. Evans,* 517 U.S. 620, 631–32, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996) (in analyzing law targeted at homosexuals, the Court first identified "rational basis" as the correct level of scrutiny, and then held that the law "fails, indeed defies, even this conventional inquiry.") An action is only entitled to the more deferential "abuse of discretion" standard of review, and re-

lieved from higher constitutional scrutiny, if it qualifies as a neutral, generally applicable action under the threshold test.

Turning to this question, I agree that the trial court's refusal to postpone was neutral and of "general applicability," and not an individualized action that demands the higher scrutiny of *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). On this point, I am persuaded by Judge Harrell's detailed analysis of the nature of the trial court's action, in light of *Sherbert* and *Smith.*

I would therefore hold that the correct level of scrutiny is *Smith's* lower level of scrutiny, which means that we apply our usual standard of review when considering trial court discretionary decisions, *i.e.,* whether the trial court abused its discretion. On this point, the majority opinion convincingly explains why the trial court's action should fail. I join the majority's analysis regarding why it was an abuse of discretion.

Because I believe this discussion resolves the question, I would decline to wade into the thorny issue of whether the court's action imposes a "substantial burden" as Judge Harrell does. This is partly because I consider some of Judge Harrell's reasoning regarding "substantial burden" to be inapposite. Judge Harrell faults Neustadter for failing to raise the issue regarding his religion earlier:

> Had the judge's denial of his motion to postpone placed such a burden on Petitioner's Free Exercise rights (or Petitioner perceived truly such a burden), Petitioner, I suspect, would have informed the trial court at some point during the period between 24 January 2008—when the final trial dates were scheduled—and 6 May 2008—the date on which Petitioner first and ultimately informed the trial court of the Shavuot conflict, less than a month before commencement of trial.

Although I agree that a party's failure to raise such an objection timely is important, and often dispositive, that delay invokes an issue of "waiver," not "substantial burden." Clearly, whether or not a state action imposes a "substantial

burden" on a party is an independent question from how adequately that party enforces his rights.[1]

Furthermore, I would not address the intriguing issue Judge Harrell raises of whether the Free Exercise clause is "applicable with equal force to the judicial branch."

1. A party's failure to make a timely assertion of the claimed infringement on his religious beliefs *may* reflect on his sincerity, and in that sense diminish the infringement. But the level of sincerity was resolved favorably to Neustadter by the trial court, and I see no reason to disturb that factual finding.